# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### 1:10-cv-20695-CIV-Moreno

| | |
|---|---|
| SOLYMAR INVESTMENTS, LTD, et. al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) |
| | ) |
| BANCO SANTANDER S.A., et. al, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Samuel A. Danon
(Florida Bar No. 892671)
Gustavo J. Membiela
(Florida Bar No. 513555)
Paulo R. Lima
(Florida Bar No. 0064364)
**HUNTON & WILLIAMS LLP**
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Tel:  (305) 810-2500
Fax:  (305) 810-2460
Email:  sdanon@hunton.com
Email:  gmembiela@hunton.com
Email:  plima@hunton.com

*Attorneys for Defendants*

September 30, 2010

# TABLE OF CONTENTS

Page

Introduction and Summary of Argument ............................................................................1

Argument .............................................................................................................................3

I.  Plaintiffs Lack Standing to Assert Direct Claims for Breach of Fiduciary Duty, Gross Negligence, Negligence, and Unjust Enrichment Against Santander Spain, OIS, and Echeverría (Counts 5-9). ...........................................................................................3

    A.  The Law of The Bahamas — the Funds' Place of Incorporation — Governs the Determination Whether Plaintiffs' Claims are Direct or Derivative. ................4

    B.  Under the Rule of *Foss v. Harbottle* and the Reflective Loss Principle, as Recognized Under Bahamian Law, Plaintiffs Lack Standing to Assert Claims on Behalf of Losses Incurred by the Funds. ..................................................6

    C.  Under U.S. Law, Plaintiffs Also Lack Standing to Sue Directly .............................7

II.  The Complaint Fails to Establish the Existence of a Fiduciary Relationship Between Plaintiffs and Santander Spain, OIS, or Echeverría (Counts 1-8) ........................................9

III.  Plaintiffs Have not Adequately Pleaded Aiding and Abetting Claims (Counts 2,6). ........11

IV.  Santander Spain is not Liable Under the Doctrine of Respondeat Superior (Counts 1, 3-5, 7-8) ...........................................................................................................................12

V.  Plaintiffs' Tort Claims are Barred by Exculpatory Clauses in Their Account Agreements (Counts 1-8). ...............................................................................................13

VI.  Plaintiffs Have not Stated a Claim for Unjust Enrichment (Count 9). ...........................15

VII.  The Complaint Fails to State a Federal Claim Upon Which Relief may be Granted (Counts 12-13). .........................................................................................................17

    A.  Legal Standard for Primary Violation .................................................................17

    B.  The Exchange Act Does not Apply Extraterritorially to the Transactions That Form the Basis for Plaintiffs' Federal Securities Law Claims. ..............................19

    C.  Plaintiffs Fail to Allege Actionable Misstatements or Omissions by Particular Defendants. ..................................................................................................22

    D.  The Complaint Fails to Allege Facts Permitting a Strong Inference of Scienter. ......................................................................................................24

E.      The Complaint Fails to Allege With Adequate Particularity Actual Reliance, Which, in This Case, Cannot be Presumed...........................................................28

1.      The Fraud-on-the-Market Presumption of Reliance Does not Apply........29

2.      Plaintiffs Fail to Plead Actual Reliance....................................................31

F.      Plaintiffs Fail to Allege Loss Causation in Connection With Certain Alleged Omissions.............................................................................................................32

G.      The Claims Under Section 20(a) of the Exchange Act Should be Dismissed......34

VIII.    Plaintiffs Have not Stated a Claim for Common Law Fraud (Count 10) .........................36

IX.     The Complaint Fails to State a Claim Based on Fla. Stat. §§ 517.301 and 517.221 Upon Which Relief may be Granted (Count 11). ...........................................................37

CONCLUSION..................................................................................................................40

CERTIFICATE OF SERVICE ..........................................................................................41

## Introduction and Summary of Argument

Solymar Investments, Ltd., Astrolite Investments, Ltd., Eternalite Investments, Ltd., and Sunrays Investments, Ltd. (collectively, "Plaintiffs") are investment companies incorporated in the Cayman Islands and owned by Panamanian citizens.  (Amd. Compl. ¶ 1.)[1]  On March 8, 2010, Plaintiffs filed a Complaint alleging 11 causes of action against Banco Santander, S.A. ("Santander Spain"), Banco Santander International ("BSI"), Santander Bank & Trust, Ltd. ("SBT"), Optimal Investment Services, S.A. ("OIS"), Manuel Echeverría Falla ("Echeverría"), Manuel Sanchez Castillo ("Sanchez Castillo"), and Ana Maria Jaureguizar ("Jaureguizar") (collectively "Defendants").  Plaintiffs filed an Amended Complaint on August 16, 2010 [D.E. # 27], which purports to assert three additional causes of action — a common law fraud claim and two counts of aiding and abetting breach of fiduciary duty.  Plaintiffs' primary purpose in amending was an attempt to avoid the Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, which held that § 10(b) of the Securities Exchange Act provides a cause of action only where "the purchase or sale is made in the United States, or involves a security listed on a domestic exchange."  130 S. Ct. 2869, 2886 (2010); *see also In re Banco Santander Securities-Optimal Litig.*, 2010 WL 3036990 (S.D. Fla. July 30, 2010) (citing *Morrison* and dismissing claims involving the same securities and several of the same defendants as this case).  However, no amount of clever pleading can bring the foreign transactions at issue in this case within the boundaries of *Morrison*, and as such, Plaintiffs have not stated a claim under federal securities law.

---

[1] Defendants previously filed a motion to dismiss based on the arbitration and forum selection clauses in the Exchange Agreement signed by Plaintiff.  [D.E. # 15].  In that motion, Defendants demonstrate that all of Plaintiffs' claims are subject to arbitration in Switzerland or, at the very least, the arbitrability of the claims (or the claims themselves) must be decided by a Swiss court.  If this Court grants that motion, it need not address the arguments raised herein. Defendants also reserve the right to bring a motion to dismiss for forum *non conveniens* if the Court does not compel arbitration of all claims alleged in the Amended Complaint.  *In re Banco Santander Securities-Optimal Litig.*, 2010 WL 3036990 (S.D. Fla. July 30, 2010).

Plaintiffs' claims are based on two theories.  First, Plaintiffs allege that Defendants improperly managed Plaintiffs' non-discretionary investment accounts by investing in Optimal Strategic U.S. Equity ("SUS") and Optimal Arbitrage ("Arbitrage," and together with SUS, the "Funds").[2]  Plaintiffs allege these investments were inconsistent with the risk profile they had chosen for their accounts (the "Mismanagement Claims").  (Amd. Compl. ¶ 3; counts 1-4). Second, Plaintiffs allege that Defendants "facilitat[ed] Madoff's fraud by investing billions of dollars of their clients' money, including Plaintiffs' money, with Madoff and his related entities without conducting adequate due diligence, despite the existence of obvious 'red flags'" (the "Diligence Claims").  (Amd. Compl. ¶ 9, counts 5-13.)

Plaintiffs' investments in the Funds were held through their accounts with SBT in The Bahamas.[3]  In connection with their accounts at SBT, Plaintiffs each signed an Account Agreement with SBT and agreed that the account services provided would be subject to the First Amended Terms & Conditions (the "Amd. Terms & Conditions").[4]  No Plaintiff alleges any direct relationship with OIS, Santander Spain, or Echeverría.  Plaintiffs do not sue BMIS or Madoff—the confessed architect of the fraud—or allege that any Defendant was in any way complicit with Madoff.  As demonstrated below, because Plaintiffs' allegations are insufficient

---

[2] SUS and Arbitrage are, in effect, trading companies of Optimal Multiadvisors, Ltd. ("Multiadvisors Bahamas"), an investment company organized under the laws of The Bahamas. Optimal SUS (Ireland) and Optimal Arbitrage (Ireland) are sub-funds of Optimal Multiadvisors (Ireland) Public Limited Company ("Multiadvisors Ireland", and collectively with Multiadvisors Bahamas, "Multiadvisors"), an investment company organized under the laws of Ireland.

[3] SBT asserts and specifically reserves its personal jurisdiction defense in this matter.  The parties have conferred, and because of the efficiencies involved, have agreed that SBT may raise lack of personal jurisdiction as an affirmative defense in its answer to the Amended Complaint, if filing an answer becomes necessary.

[4] True and correct copies of the Amended Terms & Conditions for each Plaintiff are attached as Exhibits "A"-"D".  These documents are central to Plaintiffs' claims and, therefore, may be properly considered on a motion to dismiss.  *See, e.g.*, *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *Jackson v. Bellsouth Telecomms., Inc.*, 181 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001).

to state a claim for relief, whether asserted under state common law or under U.S. and Florida securities laws, the Amended Complaint should be dismissed.

## Argument

As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should…be exposed at the point of minimum expenditure of time and money…."  550 U.S. 544, 558 (2007).  Although a plaintiff need not plead facts in detail, claims based upon "unadorned, the-defendant-unlawfully-harmed-me accusations" warrant dismissal.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).   While *Twombly*'s plausibility standard, which applies to "all civil actions," *Iqbal*, 129 S. Ct. at 1953, is not akin to a "probability requirement, . . . it asks for more than a *sheer possibility* that a defendant has acted unlawfully," *id.* at 1949 (emphasis added).  "[T]o survive a motion to dismiss, a complaint must now contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).  Thus, "[w]here a complaint pleads facts . . . 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility,'" *id*. at *10 (quoting *Twombly*, 550 U.S. at 557), and dismissal is appropriate.

**I.**    **Plaintiffs Lack Standing to Assert Direct Claims for Breach of Fiduciary Duty, Gross Negligence, Negligence, and Unjust Enrichment Against Santander Spain, OIS, and Echeverría (Counts 5-9).**

Plaintiffs' claims against OIS, Santander Spain and Echeverría for breach of fiduciary duty, gross negligence, negligence and unjust enrichment are premised upon Defendants' alleged failure to perform adequate due diligence on Madoff and Defendants' alleged failure to monitor Plaintiffs' investments in the SUS and Arbitrage funds.   (*See, e.g.*, Amd. Compl. ¶ 358 ("Plaintiffs entrusted their assets to OIS, Echeverría, and Santander Spain, by investing in the Optimal Funds and reposed confidence in OIS, Echeverría, and Santander Spain with respect to the management of [the funds'] assets."); Amd. Compl. ¶ 399 ("OIS, Echeverría, and Santander

Spain failed to … monitor Madoff on an ongoing basis to any reasonable degree [and] take reasonable steps to ensure that the investment of the assets of the Plaintiffs were made and maintained in a prudent and professional manner.").)  Putting aside the factual misapprehensions upon which these claims are based, all suffer the overarching legal defect that Plaintiffs—alleged only to be investors in the affected Funds—lack standing to assert them.

Under the laws of The Bahamas, which govern the affairs of the relevant Funds, a shareholder lacks standing to bring claims directly to recover injuries suffered in the first instance by the entity in which he holds shares; only the entity may sue because the cause of action belongs to the entity alone.  And even if U.S. law governed, which it does not, the same principle would dictate dismissal; at most, the claims asserted here could be asserted only through a derivative action, not through a direct shareholder action.[5]

A.     **The Law of The Bahamas — the Funds' Place of Incorporation — Governs the Determination Whether Plaintiffs' Claims are Direct or Derivative.**

The determination whether a shareholder has standing to assert claims or, instead, whether those claims belong to the corporation alone, is determined by the law of the place in which the company is incorporated.  *U.S. Med. Neuroscience Invs., L.L.C. v. Morton Plant Hosp. Ass'n*, No. 8:09-cv-464, 2009 WL 1651424, at *2 (M.D. Fla. June 12, 2009) ("In determining whether the claims at issue in this case are derivative or direct claims, this Court must apply the law of the state of [incorporation]."); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885, 2005 WL 2677753, at *3 (S.D.N.Y. Oct. 19, 2005) ("When deciding issues of 'shareholder standing,' courts must look to the law of the fund's state of incorporation.")

_____

[5] In general, a derivative suit is a lawsuit "brought by shareholders to enforce a claim on behalf of the corporation."  *Burks v. Lasker*, 441 U.S. 471, 477 (1979); *see also Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 548 (1949) (stating that a derivative action allows a stockholder "to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own").

(vacated on other grounds).[6]  This principle, referred to as "the internal affairs" doctrine, is rooted in the well-recognized doctrine that the legal relationship between a corporation and its shareholders is governed by the law of the place of incorporation.  *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir. 1990) ("The choice between derivative and direct litigation is a choice about how (and by whom) the internal affairs of the firm are managed."); *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("[T]he law of the state of incorporation normally determines issues relating to the internal affairs of a corporation.").[7]  Because the Funds in which Plaintiffs invested are incorporated in The Bahamas, Bahamian law governs this question.[8]

---

[6] *See also, e.g.*, *In re Smith Barney Fund Transfer Agent Litig.*, No. 05 Civ. 7583, 2007 U.S. Dist. LEXIS 70828, at *10 (S.D.N.Y. Sept. 26, 2007); *Casden v. Burns*, 306 Fed. Appx. 966, 974 (6th Cir. 2009); *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (7th Cir. 2006).

[7] *See also Chatlos Found., Inc. v. D'Arata*, 882 So. 2d 1021, 1023 (Fla. Dist. Ct. App. 2004) ("Claims involving internal affairs of corporations, such as breach of fiduciary duties, are subject to the laws of the state of incorporation.") (quotation marks and citation omitted); *Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir. 1998) ("Under the 'internal affairs' doctrine, the rights of shareholders in a foreign company, including the right to sue derivatively, are determined by the law of the place where the company is incorporated.").

[8] Plaintiffs' common law claims against OIS, Santander Spain and Echeverría all are based upon the alleged mismanagement of Optimal Multiadvisors, Ltd., a Bahamian company, and its two Bahamian sub-funds, SUS and Arbitrage.  (*E.g.*, Amd. Compl. ¶¶ 10, 25, 358.)  While Plaintiffs invested indirectly in the Bahamian funds through Multiadvisors Ireland, an Irish company, the Irish funds were simply an investment vehicle into SUS and Arbitrage.  Thus, because the ultimate question is whether the claims at issue belong to the affected Bahamian Funds, or instead to Plaintiffs as investors in those Funds, Plaintiffs' claims are dependent upon the application of Bahamian law.  In any event, Irish law, similar to Bahamian law, follows British law in recognizing the principles enunciated in *Foss v. Harbottle,* 67 ER 189 (1843).  *See Tomran, Inc. v. Passano*, 159 Md. App. 706, 729-30 (Md. Ct. Spec. App. 2004) (noting Ireland's recognition of the Rule in *Foss v. Harbottle* and quoting *O'Neill v. Ryan*, [1993] I.L.R.M. 557, 559, for the proposition that "where a wrong has been done to a company it is for the company itself to seek redress for the injury done to it").  As demonstrated below, that rule bars Plaintiffs' claims here.

B.     **Under the Rule of *Foss v. Harbottle* and the Reflective Loss Principle, as Recognized Under Bahamian Law, Plaintiffs Lack Standing to Assert Claims on Behalf of Losses Incurred by the Funds.**

As set forth in the accompanying Rule 44.1 declarations of Robert Hildyard, QC,[9] Bahamian law is clear that a shareholder does not have standing to bring a direct action to redress wrongs sustained by the company of which he is a shareholder.  (Hildyard Decl. ¶ 15 *et seq.*)  Under the rule of *Foss v. Harbottle*, a seminal English case decided by the House of Lords in 1843, only the corporation (here, the Funds) may bring suit for breaches of duties owed to the corporation; shareholders may not.  (Hildyard Decl. ¶ 17.)[10]  And under the closely related principle (also recognized in The Bahamas) barring the assertion of shareholder claims for "reflective loss," the shareholder, even in situations in which it is owed a direct duty by an alleged wrongdoer, cannot recover for harms that simply "reflect" losses suffered by the corporation.  (Hildyard Decl. ¶¶ 23-24.)  Rather, in such a case, the claims remain vested in the company, and the company alone can sue.  *Foss v. Harbottle* and the Reflective Loss Principle avoid the potential for duplicative recoveries, and prevent prejudice to the rights of corporate creditors and other shareholders.  (Hildyard Decl. ¶ 27.)  They also respect the prerogative of the directors of the corporation to determine whether it is in the interest of the corporation to assert, prosecute, and settle claims against persons who have violated duties owed to the corporation. (Hildyard Decl. ¶ 18.)

---

[9] The declarations of Robert Hildyard were prepared in connection with the litigation formerly pending in this District before the Hon. Paul C. Huck.  *See In Re: Banco Santander Securities-Optimal Litig.*, 09-20215-civ-Huck/O'Sullivan.   The principles set forth in the Hildyard Declarations apply with equal force in this action.  References to Mr. Hildyard's Declaration dated November 17, 2009 are cited to herein as "Hildyard Decl. ¶ __" (attached as Exhibit E), and references to Mr. Hildyard's Declaration dated December 23, 2009 are cited to herein as "Hildyard Supp. Decl. ¶ __" (attached as Exhibit F).

[10] As explained by Mr. Hildyard in his Second Declaration, decisions of English courts, specifically the UK House of Lords, are in practice treated as binding in The Bahamas. (Hildyard Supp. Decl. ¶ 5.)

The rule of *Foss v. Harbottle* and the Reflective Loss Principle apply here, and require the conclusion that Plaintiffs may not assert the breach of fiduciary duty, negligence, gross negligence and unjust enrichment claims against OIS, Santander Spain and Echeverría. (Hildyard Decl. ¶ 29.) The gravamen of Plaintiffs' claims is that the Defendants failed to adequately supervise the investment of the Funds' assets, resulting in the loss of those assets. (*See, e.g.*, Amd. Compl. ¶¶ 359-60.)   Thus, as alleged, the tortious conduct was committed against the Funds themselves, to whom the Defendants are alleged to have owed duties.  Under Bahamian law (as well as U.S. law), shareholders cannot pursue these claims.  (Hildyard Decl. ¶ 12.)  Indeed, the only losses being claimed by the shareholders are the diminution of the value of their shares.  Thus, the losses are entirely "reflective" because a restoration to the Funds of the losses they suffered would remedy Plaintiffs' individual losses at the same time.  (Hildyard Decl. ¶ 23 ("such a 'loss' is merely reflective of or parasitic upon the loss suffered by the company. Put another way, if the company is restored, the shareholder's loss will be made good.").)

**C.     Under U.S. Law, Plaintiffs Also Lack Standing to Sue Directly.**

United States law is in accord with Bahamian law in recognizing the distinction between claims that may be asserted by the holders of an entity and those that may be asserted only by the entity itself.   To determine whether a shareholder has standing to bring a direct claim for common law torts, U.S. courts focus primarily on whether the corporation or the shareholder suffered the alleged injury.  *See, e.g.*, *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004); *Weinstein v. Schwartz*, 422 F.3d 476, 478 (7th Cir. 2005).   If the shareholder suffers an injury distinct from any injury sustained by the corporation, then that shareholder has standing to bring a direct claim.  *See Medkser v. Feingold*, 307 Fed. Appx. 262, 264 (11th Cir. 2008) ("A claim may be brought in a direct action . . . where the injury was sustained directly by the plaintiff bringing the suit and is separate and distinct from injuries sustained by the corporation and all other shareholders equally.").  The typical example would be a claim for securities fraud, where prospective/existing shareholders—not the corporation—

suffer injury because of material misstatements directed to them and on which they rely in their personal purchases or sales.  *See id.* at 265 (allowing a direct claim for securities fraud to proceed because it "involve[s] direct injuries sustained by these plaintiffs based [on] their own reliance on fraudulent statements and misrepresentations made to them").  By contrast, and in accord with the principle of "reflective loss," a shareholder-plaintiff does not have standing to assert claims when those claims are based on a loss that merely reflects the loss suffered by the corporation itself based on the breach of duties owed in the first instance to the corporation, rather than to the shareholder.[11]  Claims for breach of fiduciary duty typically fall into that class, when the duty allegedly breached was a duty owed to the corporation, rather than to the shareholder.[12]

Thus, in circumstances analogous to those presented here, U.S. courts routinely dismiss actions on the basis that a shareholder's direct claims involving mismanagement of an investment fund's assets may be brought, if at all, by or on behalf of the fund itself.  For example, in *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 17, 2006), shareholders in Goldman Sachs mutual funds brought direct actions for breach of fiduciary duty and unjust enrichment against the funds' investment advisors alleging, *inter alia*, mismanagement of the funds' assets.  Reasoning that such "claims of mismanagement of assets by defendants . . . fail to allege any injury independent of the

---

[11] *See, e.g.*, *Druck Corp. v. Macro Fund, Ltd.*, 290 Fed. Appx. 441, 443 (2d Cir. 2008) (finding that the plaintiff cannot bring the suit directly "because [plaintiff] cannot prevail without showing injury to . . . [the] Fund itself."); *Dueren v. Credit Suisse First Boston Corp.*, No. 02 CV 3921 (JSM), 2003 WL 21767509, at *3 (S.D.N.Y. July 31, 2003) ("Loss of investment value resulting from a breach of a duty owed to a corporation does not give rise to a direct cause of action by the corporation's shareholders.").

[12] *See Druck*, 290 Fed. Appx. at 444 (dismissing claim for breach of fiduciary duty and holding that "claims based on breach of fiduciary duty, corporate mismanagement or third party action that result in the diminution of share value belong to the corporation and can only be brought by it or a shareholder suing derivatively."); *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 375 (2d Cir. 1980) ("[A] director does not owe a fiduciary duty directly to the shareholders with respect to the shares of stock they own.").

alleged injury to the Funds," the court dismissed the plaintiffs' claims on the grounds that they could have been brought in a derivative capacity only. *Id.* at *20. Similarly, in *Druck*, the Second Circuit affirmed dismissal of a fund investor's breach of fiduciary duty claims against the fund's investment manager and directors on the grounds that the claims were derivative in nature and that the fund investor lacked standing to bring such claims. Specifically, the court there found that plaintiff's allegations, which involved injury to the fund itself, resulted in "damage to the shareholders in the form of diminution in the value of their shares" and that a shareholder could bring such claims, if at all, only in a derivative capacity. 290 Fed. Appx. at 444.[13] Here too, if, contrary to the internal affairs doctrine, claims could be brought under U.S. law, they could be brought only derivatively, not directly, as Plaintiffs attempt to do.

## II. The Complaint Fails to Establish the Existence of a Fiduciary Relationship Between Plaintiffs and Santander Spain, OIS, or Echeverría (Counts 1-8).

Plaintiffs' claims against Santander Spain, OIS and Echeverría for breach of fiduciary duty, gross negligence and negligence all are premised on the existence of a fiduciary relationship and a corresponding duty. (*See, e.g.,* Amd. Compl. ¶¶ 320, 365, 375, 381, and 395.) Under Florida law,[14] however, a "special relationship" is necessary to give rise to the existence of a fiduciary duty. *Bruhl v. PriceWaterhouseCoopers Int'l*, No. 03-23044-Civ, 2008 WL 899250, at *3 (S.D. Fla. Mar. 31, 2008). For a "fiduciary relationship to exist under Florida law, there must be *substantial evidence* showing some dependency by one party and some

---

[13] *See also Medkser v. Feingold*, 307 Fed. Appx. 262, 265 (11th Cir. 2008) ("In terms of the conversion and loss of invested funds and subsequent loss in the value of their investment, these plaintiffs retain the same opportunity to be made whole by a corporate recovery from the wrongdoer as do all the other similarly situated investors.") (internal quotation marks and citation omitted); *In re Smith Barney Fund Transfer Agent Litig.*, 05 Civ. 7583, 2007 U.S. Dist. LEXIS 70828, at *12 (S.D.N.Y. Sept. 26, 2007) (dismissing plaintiffs' direct claims against the fund's investment advisor because plaintiffs had alleged harm to the funds but no distinct harm to themselves and such claims were derivative in nature); *Debussy LLC v. Deutsche Bank AG*, 05 Civ. 5550, 2006 U.S. Dist. LEXIS 16432, at *10 (S.D.N.Y. Mar. 28, 2006) (same); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 464 (D.N.J. 2005) (same).

[14] Defendants' do not concede that Florida law applies to this case.

undertaking by the other party to advise, counsel, and protect the weaker party." *Lanz v. Resolution Tr. Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991) (emphasis added).  At the pleading stage, boilerplate allegations that a fiduciary relationship exists are insufficient.  *See Greenberg v. Miami Children's Hosp. Research Inst.*, 264 F. Supp. 2d 1064, 1071-72 (S.D. Fla. 2003); *Bruhl*, 2008 WL 899250, at *3 (holding that conclusory allegations that a fiduciary relationship existed, with no "supporting factual assertions" or allegations that the defendant bank "developed a special relationship" were insufficient to state a claim for breach of fiduciary duty).

Beyond stating that "OIS, Echeverría, and Santander Spain … owed a fiduciary duty to Plaintiffs with respect to the management, oversight, and protection of Plaintiffs' assets invested in the Optimal Funds" (*e.g.*, Amd. Compl. ¶ 365), Plaintiffs fail to plead any fact that establishes that they had any "special relationship" with any of these Defendants.  *Bruhl*, 2008 WL 899250, at *3.  Indeed, the Complaint lacks the requisite "substantial evidence" that would support "some undertaking by [OIS, Echeverría or Santander Spain] to advise, counsel, and protect the weaker party."  *Lanz*, 764 F. Supp. at 179.  To the contrary, the Amended Complaint does not allege any relationship between Plaintiffs and either OIS, Echeverría or Santander Spain.  *Compare* Amd. Compl. ¶ 19 (explaining that "Santander Bahamas served as the custodial bank for the Plaintiffs' funds, but its relationship with Plaintiffs was managed exclusively by employees, officers and/or directors of Santander Miami"), *with* Compl. ¶ 20 (describing OIS as "investment manager for Optimal Multiadvisors"); ¶ 21 (describing Santander Spain as OIS's ultimate parent that "owns 99% of OIS"); ¶ 22 (describing Echeverría as "Chief Executive Officer and Chief Investment Officer of OIS").   Thus, Plaintiffs have not alleged any relationship with regard to OIS, Echeverría and Santander Spain and, therefore, their claims for breach of fiduciary duty, gross negligence and negligence against those Defendants must be dismissed.

**III.     Plaintiffs Have not Adequately Pleaded Aiding and Abetting Claims (Counts 2, 6).**

Recognizing the weakness of their breach of fiduciary duty claims, Plaintiffs allege in the alternative that Santander Spain is liable as an aider and abettor for the alleged breaches of its subsidiaries (OIS, BSI, and SBT), and the *employees* of its subsidiaries (Echeverría, Sanchez Castillo, and Jaureguizar).  (Amd. Compl. ¶¶ 330, 376.)  But Plaintiffs cannot rely merely on the relationships between these Defendants to manufacture an aiding and abetting claim.  A claim for aiding and abetting requires: (1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing. *Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1192 (S.D. Fla. 2008). Plaintiffs have not pleaded these elements.

First, as noted in § II *supra*, OIS and Echeverría did not owe fiduciary duties to Plaintiffs and, therefore, an aiding and abetting claim based on such duties must fail.  *Hogan v. Provident Life and Accident Ins. Co.*, 665 F. Supp. 2d 1273, 1287-88 (M.D. Fla. 2009) (dismissing aiding and abetting claim where plaintiff had not sufficiently alleged that primary wrongdoer owed fiduciary duty to plaintiff).  Second, Plaintiffs have not pleaded facts showing Santander Spain provided "substantial assistance or encouragement" of the alleged breaches by any of the other Defendants.  The allegations in counts 2 and 6 are nothing more than rote recitals of the elements of the cause of action.  (*See* Amd. Compl. ¶¶ 333, 378 ("Santander Spain provided substantial assistance or encouragement to [the alleged primary wrongdoers'] breaches of their fiduciary duties to Plaintiffs.").)  Indeed, Plaintiffs make no effort to articulate any theory as to *how* Santander Spain rendered "substantial assistance" to the other Defendants.  *S&B/BIBB Hines PB3 Joint Venture v. Progress Energy Fla., Inc.*, 365 Fed. Appx. 202, 207 (11th Cir. Feb. 11, 2010) (affirming dismissal of aiding and abetting claim where complaint was "void of any facts

- 11 -

other than conclusory allegations that [the defendant] provided substantial assistance"). Therefore, the Court should dismiss these claims.

## IV.   Santander Spain is not Liable Under the Doctrine of *Respondeat Superior* (Counts 1, 3-5, 7-8).

In bringing claims against Santander Spain for breach of fiduciary duty, gross negligence, and negligence, Plaintiffs invoke the doctrine of *respondeat superior*, seeking to hold Santander Spain liable solely on the basis of the alleged actions of its subsidiaries.   The doctrine of *respondeat superior*, however is limited to circumstances involving an employer-employee relationship or its functional equivalent.   *See Vasquez v. United Enterprises of Southwest Fla., Inc.*, 811 So. 2d 759, 760 (Fla. Dist. Ct. App. 2002) ("It is a fundamental rule that the *respondeat superior* doctrine only applies when the alleged master has the ability and authority to direct and control the pertinent acts of the employee."); *Estate of Miller v. Thrifty Rent-A-Car Sys., Inc.*, No. 07-CV-1358, 2009 U.S. Dist. LEXIS 46444, at *34 (M.D. Fla. June 2, 2009).  The theory "is based on the assumption that the master controls the acts of the servant and is, therefore, liable for the consequences of those acts."  *Vigilant Ins. Co. v. Keiser*, 391 So. 2d 706, 714 (Fla. Dist. Ct. App. 1980).   Where, as here, there is no employer-employee relationship at issue, the *respondeat superior* doctrine is inapplicable.

To permit vicarious liability to attach here would circumvent the principle that liability may not be imposed on a shareholder corporation solely for the conduct of its subsidiary.  "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."  *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citations and quotation marks omitted).  Indeed, as courts in this state have recognized, in order to overcome this "deeply ingrained" principle and hold a parent corporation liable for the actions of its subsidiary, "the amount of control the parent exercises must be very significant."  *Florida v. Am. Tobacco, Co.*, 707 So. 2d 851, 855 (Fla. Dist. Ct. App. 1998).  Plaintiffs' generalized and conclusory allegations that Santander had the

"ability and authority" to "control and direct" OIS as a result of the parent-subsidiary relationship fail to approach the level of control necessary to establish vicarious liability.

Moreover, even assuming, *arguendo*, that the pleading requirements for *respondeat superior* could be satisfied by piercing the corporate veil, Plaintiffs fail to do so here. "A party seeking to pierce the corporate veil and hold a parent company liable for the actions of its subsidiary must prove: (1) that the subsidiary was a 'mere instrumentality' of the parent, and (2) that the parent engaged in 'improper conduct' through its organization or use of the subsidiary." *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998). In this regard, "improper conduct" requires a showing that the subsidiary "was a mere device or sham to accomplish some ulterior purpose…or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Id.* Here, Plaintiffs do not even attempt to allege facts showing that Santander used OIS, or any other subsidiary, as a "mere device or sham." *See Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121 (Fla. 1984) ("[C]ourts are reluctant to pierce the corporate veil" unless "it be shown that the corporation is formed or used for some illegal, fraudulent, or other unjust purpose" (*quoting Roberts' Fish Farm v. Spencer*, 153 So. 2d 718, 721 (Fla. 1963))). As such, the Court should dismiss counts 1, 3, 4, 5, 7, and 8 against Santander Spain. *Iqbal*, 129 S. Ct. at 1949.

## V.   Plaintiffs' Tort Claims are Barred by Exculpatory Clauses in Their Account Agreements (Counts 1-8).

Plaintiffs' tort claims asserted with respect to their investments in the Funds also fail because each of the Plaintiffs' account agreements with SBT contains an exculpatory provision that explicitly bars certain claims. The First Amended Terms and Conditions provide:

> Neither Bank nor any of its officers, directors, shareholders, employees, agents, or affiliates shall have any liability for losses incurred or sustained by reason of declines in the market value of property in the accounts or for losses and expenses incurred upon the purchase, retention, sale, management, or administration of such property, nor shall Bank or any of its officers, directors, shareholders, employees, agents, or affiliates have any liability in connection with any other act taken or omitted in good faith hereunder; provided, however, that the investments

recommended by Bank are not the result of a breach of Bank's duties under this agreement.

(Amd. Terms & Conditions § 48.)  Florida courts consistently uphold "clear and unequivocal" contractual exculpatory provisions.  *E.g. Tatman v. Space Coast Kennel Club, Inc.*, 27 So.3d 108, 110 (Fla. Dist. Ct. App. 2009); *Rose v. ADT Sec. Servs., Inc.,* 989 So. 2d 1244, 1249 (Fla. Dist. Ct. App. 2008); *Horizons Rehab. Inc. v. Health Care & Ret. Corp.*, 810 So. 2d 958, 963 (Fla. Dist. Ct. App. 2002); *Theis v. J & H Racing Promotions*, 571 So. 2d 92, 94 (Fla. Dist. Ct. App. 1990).  Similarly, Bahamian courts also uphold exculpatory clauses where the limitation of liability is "clearly and unambiguously expressed."  *Cowderoy v. Thompson* [1983] BHS J. No. 59.

Plaintiffs' claims in counts 1-8 fall within the scope of the exculpatory provision. Plaintiffs do not allege that their claims are "the result of a breach" of Defendants' duties under the Terms & Conditions.[15]  Plaintiffs do not allege that the Defendants breached any contractual

_____

[15] To the extent the Plaintiffs allege that their claims are based on Defendants' failures to perform contractual duties, Plaintiffs' tort claims (counts 1-8, 10) must be dismissed because the accounts that Plaintiffs maintained with SBT are governed by written agreements between the parties.  The economic loss rule provides that, where a contract exists between a plaintiff and a defendant, "contract principles are more appropriate than tort principles for resolving economic loss claims without accompanying physical injury or injury to property other than that which is the subject of the contract."  *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 208 F. Supp. 2d 1310, 1315 (S.D. Fla. 2002).  The rationale for this rule is that "parties to a contract have allocated the economic risks of nonperformance through the bargaining process [and] [a] party to a contract who attempts to circumvent the contractual agreement by making a claim for economic loss in tort is, in effect, seeking to obtain a better bargain than originally made." *Indemnity Ins. Co. of N. Am. v. American Aviation, Inc.*, 891 So.2d 532, 536 (Fla. 2004). Therefore, the Florida Supreme Court has made clear that "for a plaintiff to sustain a tort claim, the allegations establishing the tortious conduct must be independent from the allegations supporting a breach of contract."  *Excess Risk Underwriters*, 208 F. Supp. 2d at 1315 (citing *Moransais v. Heathman*, 744 So. 2d 973 (Fla. 1999)).  The rule also bars fraud claims where the allegedly fraudulent conduct relates to the performance of the contract.  *Output, Inc. v. Danka Business Sys., Inc.*, 991 So.2d 941, 944 (Fla. Dist. Ct. App. 2008).  Finally, the economic loss rule bars claims against all Defendants, even those who did not contract directly with Plaintiffs. *See Hoseline, Inc. v. U.S.A. Diversified Prods., Inc.*, 40 F.3d 1198 (11th Cir. 1994) ("[Plaintiff's] claim that the economic loss doctrine does not bar tort claims between parties who lack contractual privity is meritless for the Florida Supreme Court has held to the contrary") (citing *Casa Clara Condo. Ass'n v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244 (Fla. 1993)).

duty.  The contractual duty relevant to the investment decisions concerning the accounts, which Plaintiffs put at issue in this case, is governed by the term providing that SBT had no "discretionary authority over the accounts" and that the "Bank is authorized to place orders for the execution of such transactions as … recommended to and accepted by you."  (Amd. Terms & Conditions § 43.)  Plaintiffs do not allege that any of the Defendants executed any trade without first obtaining the required approval from Plaintiffs or that Plaintiffs did not authorize any of the trades in the accounts.  Moreover, as the clear and unequivocal language of this provision also covers SBT's "officers, directors, shareholders, employees, agents, or affiliates", it also bars Plaintiffs' claims against Santander Spain, BSI, OIS, Sanchez Castillo, Jaureguizar, and Echeverría.  The exculpatory provision in the Terms & Conditions agreement is enforceable and effectively bars Plaintiffs' claims for negligence, gross negligence and breach of fiduciary duty. Therefore, the Court should dismiss counts 1-8.

**VI.     Plaintiffs Have not Stated a Claim for Unjust Enrichment (Count 9).**

Plaintiffs' unjust enrichment claims against OIS, BSI, and SBT (count 9) should also be dismissed because Plaintiffs fail to plead facts sufficient to state a claim.  To prevail on a cause of action for unjust enrichment, a plaintiff must show that: 1) a benefit was conferred on the defendant, 2) the defendant had knowledge of the benefit conferred, 3) the defendant accepted and retained the benefit, and 4) it would be inequitable for the defendant to retain the benefit without compensation to the plaintiff.  *Tracfone Wireless, Inc. v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1319 (S.D. Fla. 2010) (citing *N.G.L. Travel Assocs. v. Celebrity Cruises, Inc*., 764 So.2d 672, 675 (Fla. Dist. Ct. App. 2000)).  Allegations of a vague, indirect benefit are insufficient. *See NOVA Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1007 (11th Cir. 2004); *See also M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, *10 (S.D.N.Y. March 17, 2009) ("It is not sufficient for defendant to receive some indirect benefit — the benefit received must be specific and direct to support an unjust enrichment claim").  Rather, only where a specifically identified benefit is alleged to have been "directly conferred" upon the defendant

will a plaintiff's claim for unjust enrichment survive dismissal.  *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank, N.A.*, 667 So. 2d 876, 879 (Fla. Dist. Ct. App. 1996).

With respect to OIS, Plaintiffs cannot allege that a benefit was conferred on OIS by Plaintiffs because OIS's fees were paid by the Funds, as investment advisors, and not by Plaintiffs.  *See* June 2004 Explanatory Memorandum[16] at 31 ("Optimal SUS shall pay the Investment Manager an investment management fee…").  Absent any allegation of a direct benefit, Plaintiffs' unjust enrichment claim against OIS is insufficient as a matter of law.  *See*, *e.g.*, *Tilton v. Playboy Entm't Group, Inc.*, No. 88:05-cv-692-T-30TGW, 2007 U.S. Dist. LEXIS 1393, at *9-11 (M.D. Fla. Jan. 8, 2007) (dismissing unjust enrichment claims because plaintiff "does not allege, and cannot allege, that she conferred a direct benefit on the Defendants").  With respect to BSI and SBT, Plaintiffs base their unjust enrichment claim on the "receipt or retention of fees and other monies that these defendants obtained at the expense of Plaintiffs and to which [Defendants] were not entitled."  (Amd. Compl. ¶¶ 408-10.)  Such allegations are insufficient to plausibly support Plaintiffs' claim against SBT and BSI.  *Iqbal*, 129 S.Ct. at 1949.  To the extent Plaintiffs conferred a benefit upon BSI or SBT, Plaintiffs received exactly what they bargained for — shares of the Funds.  *See Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1369 (S.D. Fla. 2007) (dismissing unjust enrichment claim and holding plaintiffs had not alleged that the defendants had unjustly retained a benefit because the parties had obtained exactly what they bargained for).  Plaintiffs improperly seek to turn a contract-based unjust enrichment claim into a strict liability tort, whereby anytime circumstances beyond a party's knowledge or control cause loss, a party who paid for services that were actually rendered can seek compensation.  Therefore, their unjust enrichment claims must fail as a matter of law.

---

[16] Plaintiffs cited the June 2004 EM in the Amended Complaint, but did not attach a copy.  Nevertheless, this document is central to Plaintiffs' claims and, therefore, may be properly considered on a motion to dismiss.  *See* fn. 4 *supra*.  The June 2004 Explanatory Memorandum is attached as Exhibit G.

Finally, Plaintiffs' unjust enrichment claims against SBT and BSI must also be dismissed because the accounts maintained by Plaintiffs with SBT and BSI are governed by the written contract between the parties.  Under Florida law, it is well settled that an unjust enrichment claim cannot stand if the subject matter of that claim is covered by a valid and enforceable contract. *Reese v. JPMorgan Chase & Co.*,  686 F. Supp. 2d 1291, 1309 (S.D. Fla. 2009) (citing *Moynet v. Courtois*, 8 So.3d 377 (Fla. Dist. Ct. App. 2009)).  Plaintiffs allege that "Santander Miami and Santander Bahamas were enriched at the expense of Plaintiffs, including by taking Plaintiffs' monies in the form of commissions and other fees for their purported management of Plaintiffs' investment, and the purported, but in fact non-existent, capital appreciation of such assets." (Amd. Compl. ¶ 411.)  Any entitlement to such fees by either SBT or BSI, however, is governed by the Terms & Conditions agreement, thus requiring that Plaintiffs' unjust enrichment claims be dismissed.  (*See* Amd. Terms & Conditions, § 14.)

## VII.   The Complaint Fails to State a Federal Claim Upon Which Relief may be Granted (Counts 12-13).

Plaintiffs allege that BSI, SBT, OIS and Echeverría violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), and they seek redress under Rule 10b-5. Plaintiffs also assert that Santander and Echeverría violated Section 20(a) of the Exchange Act, which imposes liability on persons who, while not themselves "primary" violators, nevertheless control them.  Both sets of claims must be dismissed because the Complaint fails adequately to plead a primary violation.

### A.   Legal Standard for Primary Violation.

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omissions and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). A plaintiff must allege that the conduct of each defendant satisfies each of the elements or preconditions for liability, and must meet the relevant pleading standards with respect to each. *See id.* at 158. As a threshold matter, Section 10(b) does not cover securities transactions outside of the United States, and therefore, a plaintiff is entitled to relief only if its claims are based on "the purchase or sale [] made in the United States, or involv[ing] a security listed on a domestic exchange." *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2886 (2010).[17]

Allegations of securities fraud under Section 10(b) and Rule 10b-5 must also meet the heightened pleading standards of Fed. R. Civ. P. 9(b). *See Cordova v. Lehman Bros., Inc.*, 526 F. Supp. 2d 1305, 1312-13 (S.D. Fla. 2007), *aff'd in part*, *vacated and remanded in part on other grounds, Puterman v. Lehman Bros., Inc.*, 332 Fed. Appx. 549 (11th Cir. May 29, 2009) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1321 (S.D. Fla. 2004). Rule 9(b) requires a complaint to identify "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba*, 256 F.3d at 1202. In cases alleging fraud by multiple defendants, Rule 9(b) requires that the complaint "inform each defendant of the nature of his alleged participation in the fraud." *Bruhl v. Price WaterhouseCoopers Int'l*, No. 03-

---

[17] The Supreme Court held that the extraterritorial application of federal securities law does not concern subject matter jurisdiction, but is a "merits question" to be addressed under Fed. R. Civ. P. 12(b)(6). *Id.* at 2877.

23044-Civ-Marra, 2007 WL 997362, at *3 (S.D. Fla. Mar. 27, 2007).  If this standard is not met, the case must be dismissed.  *Ziemba*, 256 F.3d at 1202.[18]

### B.   The Exchange Act Does Not Apply Extraterritorially to the Transactions That Form the Basis for Plaintiffs' Federal Securities Law Claims.

The primary reason that Plaintiffs cannot maintain their federal securities law claims is that, pursuant to the Supreme Court's recent decision in *Morrison*, the Exchange Act does not extend to the foreign securities transactions at issue in this case.  In *Morrison*, the Court held that § 10(b) applies "only to transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  130 S. Ct. at 2884.  Here, Plaintiffs do not contend — nor could they — that the Fund they purchased was traded on a U.S. exchange.  Nor can their purchases of Fund shares be considered "domestic transactions," as the Fund documents demonstrate that the purchases occurred outside the United States.  As such, Plaintiffs are not entitled to relief under federal securities law.

Plaintiffs' attempts to bring this case within the bounds of *Morrison* fail as a matter of law.  First, they make the wholly conclusory allegation that Defendants made misrepresentations "in connection with the purchase or sale of securities on an American stock exchange, and/or the purchase or sale of any other security in the United States."  (Amd. Compl. ¶ 449.)  These allegations, which are mere legal conclusions that parrot the language of *Morrison*, may be ignored unless supported by factual allegations.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009) ("[A]llegations [that] are conclusory are not entitled to be assumed true.").  Furthermore, as discussed below, that conclusion is contradicted by the allegations in the Amended Complaint and the documents cited therein, which demonstrate that Plaintiffs purchased a foreign fund in an offshore transaction.

---

[18] The plaintiff must also allege that each defendant actually made a false statement or omission.  If an alleged misrepresentation is not "attributable to the defendant," the defendant cannot be liable.  *Ziemba*, 256 F.3d at 1205; *Bruhl*, 2007 WL 997362, at *3.

Next, Plaintiffs contend these were domestic transactions based on the Fund's Explanatory Memoranda, which states: (1) that the Fund had "established a discretionary account with a US broker-dealer [Madoff]…registered with both the U.S. Securities and Exchange Commission…and the National Association of Securities Dealers, Inc."; and (2) that Madoff's purported investment strategy for Optimal SUS consisted of "purchasing a basket of thirty to forty large-capitalization S&P 100 stocks" and other securities traded on the New York Stock Exchange, including S&P 100 stock options and U.S. Treasury Bills. (Amd. Compl. ¶ 451.) But Plaintiffs' reliance on these alleged connections to the United States is misplaced as a matter of law. As the Supreme Court explained, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States…[b]ut the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 130 S. Ct. at 2884 (emphases in original). Thus, as courts interpreting *Morrison* have noted, whether a sale or purchase is a domestic transaction hinges on where the relevant security changed hands. *See Cornwell v. Credit Suisse Group*, No. 08-Civ-3758, 2010 WL 3069597, *1 (S.D.N.Y. July 27, 2010) (noting that, under *Morrison*, "§ 10(b) claims would not extend to foreign securities trades executed on foreign exchanges even if purchased or sold by American investors, and even if some aspects of the transaction occurred in the United States"); *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, *1 (C.D. Cal. July 16, 2010) (noting that *Morrison* "leaves little doubt that [the Supreme Court] believed that United States securities laws should defer to the law of the country where the security is exchanged"). Here, the relevant purchase occurred outside the United States, and Plaintiffs' citations to other alleged U.S. activity are irrelevant.

As the June 2004 Explanatory Memorandum[19] makes clear, Plaintiffs purchased shares of *Multiadvisors*, which in turn entrusted management of its sub-fund, SUS, to a broker-dealer. *See*

---

[19] Plaintiffs rely on language in the June 2004 EM as the primary basis for arguing that these were domestic transactions. *See* Amd. Compl. ¶¶ 451-52.

2004 EM at 8 (describing Multiadvisors and listing SUS as one of the Fund's "trading companies"); *id.* at 30 ("The Broker-Dealer is responsible for the execution of [SUS's] trading strategy."); *see also* Amd. Compl. ¶ 10 ("Optimal Multiadvisors, *through its sub-fund* Optimal Strategic U.S. Equity, Ltd., was one of the 'feeder funds' that helped Madoff perpetuate the fraud.   The vast majority of the capital of the *Optimal SUS sub-fund* was invested with Madoff….") (emphases added).

The EM describes the procedure for purchasing shares of Multiadvisors as follows: "Purchasers may subscribe for Participating Shares on any month end valuation date…by completing the Subscription Form included with this Memorandum, and sending a faxed Subscription Form[,] provided the original in the form attached follows immediately."   2004 EM at 7.   Specifically, prospective investors in Multiadvisors were required to fax and mail a completed subscription form to the Fund Administrator, Management International (Dublin) Limited ("Management International"), in *Dublin, Ireland*.   *See* June 2004 EM at 44 (listing Management International's fax number and address in Dublin to which subscription form must be sent).   The sale of Multiadvisors shares only became final upon the Fund Administrator's acceptance of the Subscription Form:

> I/We hereby unconditionally and irrevocably, on the terms of this Subscription Form, the Memorandum and the Articles of Association of the Fund, (***subject to the acceptance of this Form by the Company*** which acceptance will be evidenced by the issue of the respective Shares), subscribe for: [followed by a chart listing various sub-funds, including Optimal SUS].

June 2004 EM at 39 (emphasis added).   In sum, notwithstanding Plaintiffs' irrelevant allegations concerning Madoff's licensing in the U.S. and his purported trading strategy, Plaintiffs bought shares of *Multiadvisors*, and their purchase of those shares was complete upon acceptance of the subscription forms by Management International *in Ireland*.   As such, they are not domestic transactions and cannot serve as the basis for a federal securities law claim.

Finally, this Court need not break new ground in finding that Plaintiffs' claims violate *Morrison*'s prohibition on the extraterritorial application of § 10(b).   Judge Paul C. Huck reached

that conclusion in a case recently decided in this District involving the same securities and a set of defendants that included four of the defendants in this case.  *In re Banco Santander Securities-Optimal Litig.*, 2010 WL 3036990 (S.D. Fla. July 30, 2010).  Like Plaintiffs here, the plaintiffs in that case based their claims on alleged misrepresentations and omissions in connection with their purchase of shares of Multiadvisors.  Dismissing the federal claims, Judge Huck concluded:

> In this case, the Plaintiffs neither purchased shares on an American stock exchange, nor did they purchase shares in the United States.  They made off-shore purchases in off-shore Bahamian investment funds closed to United States investors.  The Plaintiffs' securities fraud claims therefore do not survive *Morrison*.

2010 WL 3036990, at *5.  This Court should reach the same result here and dismiss the federal securities claims for failure to state a cause of action.

### C.    Plaintiffs Fail to Allege Actionable Misstatements or Omissions by Particular Defendants.

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that each defendant made a false statement or omission.  *Stoneridge*, 552 U.S. at 157.  If an alleged misrepresentation or omission is not "attributable to the defendant," the defendant cannot be liable.  *Ziemba*, 256 F.3d at 1205; *Bruhl*, 2007 WL 997362, at *3.

Here, Plaintiffs fail to attribute most of the misrepresentations and omissions alleged in the Complaint to any specific Defendant; instead, they obfuscate the source of alleged misrepresentations by lumping Defendants together as a single actor. (*See*, *e.g.*, Amd. Compl. ¶ 455(g) ("Defendants … misrepresent[ed] that they and their financial services providers and auditors were conducting extensive due diligence."; *see also id.* ¶¶ 455(f) - (k).)  Courts have routinely rejected this improper tactic as insufficient to meet the pleading requirements of Rule 8(a).  *See Bruhl*, 2007 WL 997362, at *3 (explaining that plaintiffs may not "lump[] together"

defendants and instead must "differentiate their allegations") (quoting *Brooks v. Blue Cross & Blue Shield of Fla.*, *Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)).[20]

Moreover, even assuming that certain of Defendants' alleged omissions and misrepresentations are based on the Multiadvisors Memoranda (*compare* Amd. Compl. ¶ 455 (d), (f) - (k) *with* ¶ 69), those statements are not alleged to have been made by any Defendant. As is evident from their cover pages, those memoranda were issued by Multiadvisors, a "multi-portfolio investment company incorporated under the laws of … the Bahamas." (*See, e.g.*, Exhibit G, at 6.)  As the Complaint goes out of its way to emphasize, Multiadvisors is not a defendant in this action.  (Amd. Compl. ¶ 25.)  The Eleventh Circuit has held that, in the absence of any allegation that a defendant authored any allegedly false statement, the defendant cannot be accused of securities fraud relating thereto.  *Ziemba*, 256 F.3d at 1206 (rejecting argument that a misrepresentation could be attributed "to those who were never identified to investors as having played a role in the misrepresentations"); *Cordova*, 526 F. Supp. 2d at 1311-12 (rejecting plaintiffs' contention that the defendant, solely by virtue of its discussion in the materials, had become "responsible for any misconduct or fraud [allegedly] committed by" the other company because to hold otherwise "would too broadly expand liability and would require the Court to find misstatements by implication, rather than to analyze the specific working of statements actually made ….").

---

[20] While the Amended Complaint cites to a statement purportedly from OIS's website that "intensive due diligence is vital to ensuring the integrity and sustainability of the investment process" and "[e]ach investment undergoes lengthy and detailed scrutiny according to clearly defined manager selection criteria" (Amd. Compl. ¶ 277), it does not explain what, if anything, is fraudulent or misleading about it, or when the statement was made, *e.g.*, before or after Plaintiffs invested.  Thus, the allegation flunks the test for particularity and plausibility laid down in Rule 9(b) and *Twombly*.  But even accepting the adequacy of the allegation, there is no basis for attributing statements that emanated from OIS's website to Defendants other than OIS.  *See, e.g.*, *Bruhl*, 2007 WL 997362, at *3.

**D.    The Complaint Fails to Allege Facts Permitting a Strong Inference of Scienter.**

Plaintiffs' claims also fail because they have not pleaded facts giving rise to a strong inference of scienter.  A plaintiff can plead scienter by alleging facts permitting a strong inference that each defendant exhibited "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  While "a showing of severe recklessness can satisfy the scienter requirement," *Cordova*, 526 F. Supp. 2d at 1318, severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but *an extreme departure from the standards of ordinary care*, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999) (emphasis added). Scienter must be pleaded "for each defendant with respect to each violation." *Mizzarro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Philips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)).

To test the sufficiency of a plaintiff's allegations of scienter, the Supreme Court has directed district courts to engage in a comparative analysis, examining "all the facts alleged" and "consider[ing] plausible nonculpable explanations for the defendant's conduct."  *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  A complaint's allegations must thus be examined "holistically" with "omissions and ambiguities count[ing] against inferring scienter." *Id.* at 326.  At the end of the day, the "strong inference" of scienter must be one that is "more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations."  *Id.* at 324.

The Complaint alleges that the Santander Defendants misled Plaintiffs by asserting that they would engage in due diligence, and by stating that the monies the Funds invested with Madoff were in fact invested by Madoff in actual securities (stocks, options, and Treasury bills).

(*See, e.g.*, Amd. Compl. ¶¶ 455-59.)[21]   In an effort to satisfy the scienter requirement, the Complaint makes conclusory, boilerplate allegations that these misstatements were made with knowledge that they were untrue or with reckless disregard as to their truth.  (Amd. Compl. ¶¶ 457-459.)  Those allegations are insufficiently particular and, indeed, highly implausible, in light of the numerous allegations regarding the extensive due diligence efforts that were undertaken and Defendants' reasonable (and widely shared) belief that Madoff was a reputable, regulated broker who held and traded actual securities on behalf of his customers.

As a threshold matter, the Complaint does not plead facts that would support an inference that the Santander Defendants *knowingly* misled the Funds' investors that their assets had been invested with a broker who was in fact not investing their money in securities at all.  To the contrary, the allegations all attest to the uniform, albeit honestly mistaken, understanding of Defendants and their agents and employees that Madoff was a legitimate broker-dealer who, in fact, held custody of securities on behalf of his thousands of customers, including those of the Funds.  (*See, e.g.*, Amd. Compl. ¶ 211 ("In effect, OIS accepted Madoff's pieces of paper that said that Madoff had executed certain transactions without any verification…."); *id.* ¶ 196 ("OIS…accepted these explanations about …Delivery and Copying Risk at face value…."); *id.* ¶ 200 ("Madoff confirmed that…the assets of these funds…are held in the DTC.").)  Similarly, the very allegations that Plaintiffs advance in an effort to show that Defendants' due diligence efforts were not adequate overwhelmingly show that OIS was in fact performing extensive, expensive, on-site due diligence.  To that end, the Complaint alleges that "OIS had a team of at least four investment and due diligence officers for a substantial period of time after 2001."  (Amd. Compl.

---

[21] Even those allegations that do not specifically reference Defendants' due diligence or Madoff's custody of securities are, at bottom, premised upon either, or both, of those premises. Specifically, Plaintiffs' allegations that Defendants misrepresented "that the Optimal SUS and Optimal Arbitrage funds were well diversified, had low volatility and had achieved consistent returns" (Amd. Compl. ¶ 455 (a)) and that "the Optimal SUS and Arbitrage Funds achieved specific quantified statistical analyses … all of which were false as the funds were, in whole or in part, frauds," (Amd. Compl. ¶ 455 (b)), are based upon Defendants' alleged failure to conduct adequate due diligence on the Funds.

¶ 209.)  The employment of those personnel and the efforts they undertook (*e.g.*, *id.* ¶ 214 (referring to "Echeverría's close oversight of Madoff")) would have been pointless had Defendants known that Madoff was not investing Fund assets in the securities as he said he was. The Complaint details the extensive due diligence efforts that Defendants undertook.  (*E.g., id.* ¶¶ 216, 218, 250-53.)  That these due diligence efforts — like those of Madoff's other investors, the SEC, and FINRA — did not uncover the fraud does not imply that extensive due diligence did not take place, much less that Defendants *knew* that the due diligence was inadequate.  Thus, the theory that the Santander Defendants knowingly lied when they said they were conducting due diligence, and knowingly lied when they said that the Funds had deposited assets with a broker who was pursuing a specific securities investment strategy, is a non-starter.

Nor can Plaintiffs satisfy the scienter requirement by suggesting that Defendants' alleged statements about OIS having conducted due diligence concerning the Funds' investments with Madoff and about his actual custody and investment of securities were made with *severe* recklessness as to their truth.  It is not severely reckless for an investment manager who employs dedicated financial professionals for the purpose of conducting due diligence on Madoff and other investment managers (*id.* ¶¶ 216-18), and who in fact takes the steps described in the Amended Complaint, to represent that "[OIS] uses an intensive and thorough due diligence process" (*id.* ¶ 220) (quoting OIS's 2005 Due Diligence Questionnaire).  And the suggestion that Defendants were severely reckless when they stated that Madoff was in fact trading securities, is equally flawed.  That the SEC, which, unlike Defendants, had the ability to ascertain Madoff's custody of securities, failed to detect his fraud strongly supports a competing inference — whose consideration *Tellabs* compels, 551 U.S. at 324 — that Defendants' failure to detect Madoff's fraud was not due to their intentional or severely reckless failure to ascertain his custody of the securities he purported to trade.  The far more likely, and hence plausible, inference is that Defendants, like thousands of other sophisticated investors around the world, genuinely believed Madoff, a registered US broker-dealer regulated by the Securities and Exchange Commission

- 26 -

and the National Association of Securities Dealers (currently, the Financial Industry Regulatory Authority), and whose financial and regulatory standing was good, held and traded the securities reflected in the thousands of trade tickets and statements he regularly sent to OIS.  (Amd. Compl. ¶ 210.)

At the end of the day, Plaintiffs' allegations fail to support an inference of scienter that is "cogent and compelling . . . in light of other explanations."  *Tellabs*, 551 U.S. at 324; *see also Iqbal*, 129 S. Ct. at 1949 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.").  If Madoff's scheme was so obviously fraudulent and so easily detectable, there is simply no rational explanation why thousands of sophisticated investors would have continued to invest vast sums of money with Madoff and why the SEC would have concluded, after considering some of the very "smoking guns" Plaintiffs cite in the Complaint, that there was "no evidence of fraud."  *See Tellabs*, 551 U.S. at 326.[22]

The widespread failure of others with equal or greater access to information to detect a fraud was particularly significant in *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 418 (S.D.N.Y. 2007), *aff'd sub nom., South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009), a case strikingly similar to this one.  In *Bayou*, the plaintiffs, who had lost money in a Ponzi scheme orchestrated by a hedge fund, alleged that their investment advisor was liable for securities fraud because it had made a number of alleged misrepresentations concerning its due diligence of the fraudulent hedge fund.  *Id.* at 407-12.  The plaintiffs attempted to plead scienter by asserting, *inter alia*, that, because the defendant "assumed both an initial and ongoing duty to [the plaintiffs] to investigate [the hedge fund] thoroughly, . . . its failure to uncover the . . . fraud demonstrates that it breached that duty, and that breach of duty demonstrates the requisite recklessness."  *Id.* at 416.  The court dismissed the complaint, finding that the plaintiffs had failed to plead scienter.  The court found that:

---

[22] *See* www.sec.gov/news/studies/2009/oig-509-exec-summary.pdf.

> One substantial competing inference this court may draw from these alleged facts is that due diligence would not have uncovered the fraud. The Complaint alleges that [the hedge fund] concealed the fraud from investors, the public, investment advisors, other industry professionals and regulators . . . for *nine years*. Given that [the principals of the hedge fund] managed to deceive the entire investing community for nearly a decade, [the plaintiffs'] allegation that [the defendant] would have uncovered the fraud had it conducted the due diligence it promised is far from compelling.

*Id.* at 418 (emphasis in original). Here, as in *Bayou*, a large number of investors and government regulators had enormous incentives to ensure that Madoff was running a legitimate operation. In the end, however, none uncovered the fraud, which lasted far longer than the nine years deemed significant by the *Bayou* court. It was only Madoff's confession to family members and, later, to the FBI, that led to his arrest. On the facts of this case, as in *Bayou*,

> the inference of recklessness alleged by plaintiff[s] — that [defendants'] failure to uncover the fraud evidences a reckless lack of due diligence — [is] less compelling than an opposing inference — that [defendants'] failure to discover the fraud merely places [them] alongside the SEC, the IRS, and every other interested party that reviewed [the hedge fund's] finances. The inference proposed by [plaintiffs] is thus not "strong in light of other explanations," and [their] pleading cannot survive a motion to dismiss.

*Id.* (quoting *Tellabs*, 127 S. Ct. at 2510); *see also Cordova*, 526 F. Supp. 2d at 1319 (finding scienter inadequately pled because "it would be reasonable to infer that [a fraudulent scheme carried out in spite of Defendants' oversight obligations] also misled Defendants, and that Defendants might have had a business relationship without knowing of [the] fraud").[23]

### E.    The Complaint Fails to Allege With Adequate Particularity Actual Reliance, Which, in This Case, Cannot be Presumed.

"Reliance by the plaintiff upon the defendant's" misrepresentations is an "*essential*" element of any securities fraud claim, providing the "requisite causal connection between a

---

[23] Plaintiffs' attempt to plead scienter also fails because the Complaint does not specifically allege scienter for each Defendant individually. The Eleventh Circuit requires scienter to be pled "for *each defendant* with respect to *each violation*." *Mizzarro*, 544 F.3d at 1238 (quoting *Philips*, 374 F.3d at 1016) (emphasis supplied). The Complaint does not specify which Defendant, if any, either had actual knowledge of or was severely reckless with respect to the alleged misrepresentations.

defendant's misrepresentation and a plaintiff's injury." *Stoneridge*, 552 U.S. at 159 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)) (emphasis supplied).  To plead reliance, the plaintiff must allege that he was aware of the misrepresentation before his investment decision and that he invested because of the misrepresentation. *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997).

In a case such as this, a plaintiff is excused from pleading reliance only where the fraud-on-the-market presumption applies.  Because Plaintiffs have failed properly to allege actual reliance, which may not be presumed here, their federal securities fraud claims should be dismissed.

### 1.     The Fraud-on-the-Market Presumption of Reliance Does not Apply.

In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized the potential application of the "fraud-on-the-market" presumption in certain securities fraud actions. That presumption relieves a plaintiff of the need to prove that he both knew of and relied on a misstatement of material fact when he bought a widely and publicly traded security, on the theory that all publicly available "information is reflected in the market price of the security." *Stoneridge*, 552 U.S. at 159 (citing *Basic*, 485 U.S. at 247).  In such a situation, the investor is permitted to rely on the integrity of the price that is set by the interaction of market forces, because those forces are hypothesized to reflect the summation of the decisions of numerous, fully informed investors who do, in fact, rely on publicly available information in determining what a security is worth.  *Basic*, 485 U.S. at 247 ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed . . . .").

The fraud-on-the-market presumption is not appropriate for every security.  As the Supreme Court has made clear, for the presumption to apply, the security's price must be set

through the operation of a "well-developed," "efficient market."  *Id.* at 247-48.  Such a market is one "which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available.  It is principally a secondary market in outstanding securities.  It usually, but not necessarily, has continuity and liquidity . . . ."  *Camden Asset Mgmt., L.P. v. Sunbeam Corp.*, No. 99-CV-8275, 2001 WL 34556527, at *9 (S.D. Fla. July 3, 2001) (quoting *Freeman v. Laventhol & Horwath*, 915 F.2d 189, 193, 198-99 (6th Cir. 1990)).  Only such a market will "rapidly reflect[] new information in price," including, importantly, any misinformation caused by material misstatements or omissions.  If a security does not have its price set in such an efficient market, there is no basis for applying the fraud-on-the-market presumption.  *See, e.g., Camden*, 2001 WL 34556527, at *11 (holding that the presumption would not apply as "the debenture primary market and secondary aftermarket did not operate efficiently"); *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1351 (M.D. Fla. 2007); *In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 622 (M.D. Fla. 2006).

While the Complaint contains no explicit allegation regarding the market on which SUS shares traded, the Multiadvisors Memoranda makes clear that "[t]here [wa]s no public market," let alone an efficient and developed market, for such shares.  (Exh. G at 2.)  SUS shares were *not* registered for trading (*id.*, at 3), and transfers of shares could be rejected at the sole discretion of the SUS directors (*id.*, at 2).  More importantly, the value of those shares was *not* determined by market forces — *i.e.*, the aggregated bids of investors based on publicly available information.  Rather, the price was set by the Fund alone by dividing up the net asset value ("NAV") of the fund by the number of shares issued.  (*Id.*)  That is a fundamentally different valuation method than that which determines the value of securities traded on a public exchange, and one which does not justify the application of the fraud-on-the-market presumption.[24]  For securities whose

---

[24] It is not relevant that Madoff purported to be purchasing publicly-traded, blue chip U.S. stocks and options on whose market value the calculation of NAV was substantially based.  That is because the alleged misrepresentations related to the operation of the SUS Fund, not to the value of the securities that Madoff was allegedly trading.

price is set not by the interplay of publicly available information (or misinformation) with market forces, but rather through a preset algorithm for calculating "NAV," the fraud-on-the-market presumption has no logical place.  *Cf. Cymrot v. Smith Barney, Harris Upham & Co.*, No. 89-6984-CIV-UNGARO-BENAGES, 1994 U.S. Dist. LEXIS 20134, at *16-17 (S.D. Fla. May 12, 1994) (holding that the plaintiffs who purchased the bonds on a primary market may not "rely on the fraud-on-the market theory" because "[b]y definition a primary market cannot be considered an 'open and developed market'") (citing *Lipton v. Documation, Inc.*, 734 F.2d 740, 746 (11th Cir. 1984)); *In re Sahlen & Assoc., Sec. Litig.*, 773 F. Supp. 342, 356 n.14 (S.D. Fla. 1991).[25]

### 2.    Plaintiffs Fail to Plead Actual Reliance.

Because the fraud-on-the-market presumption does not apply, reliance on Defendants' alleged misrepresentations must be alleged.  The Complaint, however, does not contain sufficient allegations that Plaintiffs relied on the supposed misrepresentations identified therein.  *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 813, 816, 830-31 (S.D. Tex. 2007) (rejecting boilerplate allegations of reliance in securities fraud case in which no presumption of reliance applied); *Prime Mgmt. Consulting & Inv. Servs. v. Certain Underwriters at Lloyd's London*, No. 1:07-cv-1578-WSD, 2007 WL 4592099, at *7-8 (N.D. Ga. Dec. 28, 2007) (rejecting conclusory allegations of reliance in fraud case to which Fed. R. Civ. P. 9(b) applied); *Estate of Scott v. Scott*, 907 F. Supp. 1495, 1499 (M.D. Ala. 1995) (same for RICO claims).  To the contrary, the Complaint's boilerplate reference to reliance alleges that "Plaintiffs

---

[25] When a defendant is duty-bound to disclose material facts but fails to carry out that duty, the Supreme Court has recognized the potential application of a presumption of reliance. *Stoneridge*, 552 U.S. at 159 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)).  However, a prerequisite to the application of the *Affiliated Ute* presumption is that "[the] plaintiff's claim [be] *primarily* one of failure to disclose." *Lipton*, 734 F.2d at 742 (*emphasis added*).  Where a complaint alleges "mixed claims"—*i.e.*, allegations of "both misrepresentations and omissions"—the *Affiliated Ute* presumption does not apply.  *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987).  Here, the majority of the Complaint's allegations are misrepresentations (*see* Amd. Compl. ¶ 455), making this, at best, a "mixed" case, and thus precluding application of the *Affiliated Ute* presumption.  *See Kirkpatrick*, 827 F.2d at 722.

relied on the representations and omissions of [the Santander Defendants]." (Amd. Compl. ¶ 456.)  Such conclusory allegations are plainly insufficient to plead reliance with the requisite particularity.  *See, e.g.*, *In re Enron Corp.*, 540 F. Supp. 2d at 813.

Moreover, even if Plaintiffs had adequately alleged reliance upon the fact sheet prepared by OIS—which they have not—Plaintiffs fail to note that this fact sheet contains an explicit disclaimer that the information "has not been independently verified" and that "[p]ersons relying on this information or any opinion set forth therein shall be solely responsible for such reliance." (Amd. Compl., Ex. 2, at 3.)  Where disclaimers accompany information like that set forth in the fact sheet, reliance on such statements is not justified.  Mergens v. Dreyfoos, 166 F.3d 1114, 1118 (11th Cir. 1999) (affirming lower court's decision discounting allegations of reliance on a report that "contained an explicit disclaimer stating that the findings were based only on information provided by [a single party], that it did not independently verify such information, and that it assumed such information to be accurate.")[26]

### F. Plaintiffs Fail to Allege Loss Causation in Connection With Certain Alleged Omissions.

To plead a Rule 10b-5 claim, a plaintiff must establish both "transaction causation" and "loss causation."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  "Transaction causation, another way of describing reliance, is established when the misrepresentations or omissions cause the plaintiff to engage in the transaction in question."  *Robbins v. Koger Props.*, 116 F.3d 1441, 1447 (11th Cir. 1997).  By contrast, loss causation requires a plaintiff to demonstrate "that the untruth was in some reasonably direct, or proximate, way responsible for

---

[26] The Complaint contains considerable discussion about alleged misstatements by OIS in internal presentations and responses to questionnaires to which Plaintiffs had no access.  (*E.g.*, Amd. Compl. ¶ 219-37.)  These statements, however, are irrelevant as Plaintiffs do not—and cannot—allege that they relied upon representations of which they were unaware at the time they purchased their shares.  *Stoneridge*, 552 U.S. at 159 ("Reliance by the plaintiff upon the defendant's" misrepresentations is an "*essential*" element of any securities fraud claim, one that provides the "requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." (quoting *Levinson*, 485 U.S. at 243 (emphasis supplied))).

his loss." *Id*.  A necessary component of loss causation is "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant.  If that relationship is sufficiently direct, loss causation is established; but if the connection is attenuated … a fraud claim will not lie." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005).  In other words, "[i]f the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under [Rule 10b-5] is not permitted." *Robbins*, 116 F.3d at 1447.

Plaintiffs allege that Defendants "omit[ted] from their disclosures that Santander Miami and its officers, employees and agents were prohibited from offering and/or selling Optimal SUS and Arbitrage funds from Miami while simultaneously doing just that."  (Amd. Compl. ¶ 455(e).)  Even assuming, *arguendo*, that Plaintiffs have pleaded transaction causation with respect to this alleged omission, *i.e.*, that it contributed to their decision to purchase SUS and Arbitrage, Plaintiffs have failed to plead loss causation with respect to this alleged omission. Indeed, Plaintiffs have failed to plead any fact demonstrating that this alleged omission had any connection whatsoever to their loss, let alone that it was a reasonably direct or proximate cause of their loss. *Dura Pharms.*, 544 U.S. at 342.  This is because there is no connection.  Whether Defendants were in fact prohibited from offering or selling SUS and Arbitrage funds from Miami is entirely unrelated to the cause of Plaintiffs' ultimate loss:  the disclosure that Madoff operated a Ponzi scheme.[27]   In the absence of a showing that this alleged omission was in any way connected to Plaintiffs' ultimate loss, Plaintiffs have failed to sufficiently plead loss causation.

---

[27] Plaintiffs incorrectly infer that BSI was not authorized to allow its clients the opportunity to invest in the Funds.  BSI is an Edge Act banking corporation, a federally-chartered corporation organized under Section 25A of the Federal Reserve Act and subject to regulation by the Board of Governors of the Federal Reserve System under Federal Regulation K.  12 U.S.C. §611 *et seq.*; 12 C.F.R. §211 *et seq.*  As an Edge Act bank, BSI's clients are authorized to purchase the Funds through BSI's Miami offices in reliance on Regulation S under the Securities Act of 1933, which provides that an offering of securities by a foreign issuer will be deemed to occur outside the United States under certain requirements, which are met with respect to the Funds.

*Dura Pharms.,* 544 U.S. at 342; *see also Butterworth v. Quick & Reilly, Inc.*, 998 F. Supp. 1404, 1411 (M.D. Fla. 1998) (dismissing fraud claim, stating that "even assuming that Plaintiff was able to establish that she would have acted differently if she had known about Defendants' failure to amend its address, she has not established that this untruth was in some reasonably direct, or proximate, way responsible for her loss.").[28]

### G. The Claims Under Section 20(a) of the Exchange Act Should be Dismissed.

Plaintiffs allege that Santander Spain and Echeverría violated Section 20(a) of the Exchange Act.  (Amd. Compl. ¶¶ 463-67.)  Because Section 20(a) liability is derivative, to plead a violation thereof, the Complaint must properly allege (1) a primary violation of Section 10(b); (2) that Santander Spain or Echeverría "had the power to control the general business affairs" of the actors that committed the primary violation; and (3) that Santander Spain or Echeverría "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability."  *See Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001) (abrogated on other grounds by *Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784 (2010));

---

[28] Plaintiffs also allege that Defendants are liable under the Federal securities laws because they "fail[ed] to provide or offer to provide Plaintiffs with copies of any Prospectuses, called 'Explanatory Memoranda' or 'EMs' for any of the Optimal Funds, including SUS and Arbitrage, they recommended to Plaintiffs.  [Defendants] thereby *omitted to disclose to Plaintiffs the risks otherwise stated in the EMs* …."  (Amd. Compl.¶ 455(c) (emphasis added).)  Other alleged misrepresentations or omissions, however, are based specifically on those "risks otherwise stated" in the Explanatory Memoranda.  (*See, e.g.*, Amd. Compl. 455(k) (alleging that Defendants "misrepresent[ed] that the assets of Optimal SUS are deposited with the Broker-Dealer," a statement from the Explanatory Memoranda).)  Plaintiffs cannot have it both ways.  They cannot allege securities fraud based on Defendants alleged failure to provide the Explanatory Memoranda, and then allege securities fraud based on specific statements from those same prospectuses.  Moreover, such an attempt further underscores that "the risks otherwise stated in the EMs"—*i.e.*, that the assets of Optimal SUS are deposited with the Broker-Dealer—were wholly unrelated to Plaintiffs' loss.  In other words, had the assets of Optimal SUS actually been deposited with Madoff, as the Explanatory Memoranda stated, Plaintiffs would have suffered no loss.  *Robbins*, 116 F.3d at 1447 ("If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under [Rule 10b-5] is not permitted.").

*Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396-97 (11th Cir. 1996).  Plaintiffs must "'allege facts sufficient to satisfy . . . the three prongs of the test stated by the Eleventh Circuit." *Bruhl v. Conroy*, No. 03-23044-Civ, 2007 WL 983228, at *7 (S.D. Fla. Mar. 27, 2007).

The Section 20(a) claim fails.  In the first instance, as set forth above, the Complaint has not successfully pleaded primary liability under Section 10(b), and thus there can be no derivative, "control" liability for Santander or Echeverría.  *See Mizzaro*, 544 F.3d at 1255; *Druskin*, 299 F. Supp. 2d at 1339.  Furthermore, even if a primary violation has been properly pleaded, the allegations fail to satisfy — for either defendant — the other elements of controlling person liability.

Plaintiffs allege that Santander "had day-to-day control and exercised day-to-day control of OIS" (Amd. Compl. ¶ 431), and that Echeverría "was Chief Executive Officer and Chief Investment Officer of OIS from its inception through July 2008, and a Director of Optimal Multiadvisors and the Optimal Funds…[and] had day-to-day control and exercised day-to-day control of OIS, Optimal Multiadvisors, and the Optimal Funds" (*id.* ¶ 430).  Those boilerplate, conclusory allegations are "wholly inadequate to establish control person liability."  *Bruhl v. Conroy*, 2007 WL 983228 at *25 (noting that an "[a]llegation that restates the legal standard for control person liability but fails to provide [supporting] facts . . . does not adequately plead control person liability," and holding that the plaintiffs' allegations that the director defendants supervised the company's administration of the fund and that the directors acted on behalf of the company were insufficient); *see also id.* at *4 ("Plaintiff's claim for control personal liability under 20(a) fails because there are . . . only conclusory allegations.").  The allegations in the Amended Complaint that Santander "owned 99% of OIS" (Amd. Compl. ¶ 21) and that Santander had day-to-day control over OIS solely because "OIS was a wholly owned subsidiary of Santander at all relevant times" (*id.* ¶ 466) also are insufficient.  Simply asserting control of an entity based on an ownership stake — however large — is, without more, insufficient to

maintain a Section 20(a) cause of action.  *See Theoharous*, 256 F.3d at 1227 (requiring allegations that defendant positioned itself to assert actual control over the subsidiary).[29]

## VIII.   Plaintiffs Have not Stated a Claim for Common Law Fraud (Count 10)

Many of the reasons that bar Plaintiffs' 10b-5 federal securities law claim also bar their claim for common law fraud.  This is because the primary difference between the two claims is the jurisdictional element.  *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 376 (1991) (Kennedy, J., dissenting) ("Once federal jurisdiction is established, a § 10(b) plaintiff must prove elements that are similar to those in actions for common-law fraud. Each requires proof of a false or misleading statement or omission, reliance thereon, damages caused by the wrongdoing, and scienter on the part of the defendant.") (internal citations omitted); *see also Alna Capital Assocs. v. Wagner*, 758 F.2d 562, 565 (11th Cir. 1985) (noting elements of a common law fraud are "for all relevant purposes, identical to those of federal and Florida statutory securities fraud").  As discussed in detail above, Plaintiffs have failed to adequately allege an actionable misrepresentation or omission (§ VII(C) *supra*), scienter (§ VII(D) *supra*),[30] or actual reliance (§ VII(E)(2) *supra*).  For these reasons, the Court should dismiss Plaintiffs' common law fraud claim against Santander Spain, BSI and OIS.

---

[29] Plaintiffs also have not met the third prong of the test, as they have failed to plead with any particularity that Santander Spain or Echeverría had power or control over any specific corporate policy underlying the alleged primary securities law violations.  Indeed, the generalized allegation that Echeverría and Santander "had the power to control or influence the specific corporate policy (e.g., the failure to conduct due diligence) at OIS" (Amd. Compl. ¶¶ 465-66) falls well short of the fact-based allegations necessary to plead control for the purposes of Section 20(a).  *See, e.g.*, *In re Friedman's Sec. Litig.*, 385 F. Supp. 2d 1345, 1375 (N.D. Ga. 2005) (holding that the plaintiffs' allegations against certain defendants were "too conclusory and otherwise insufficient as a basis to impose control person liability," because the plaintiffs did not allege that the defendants were responsible for "specific conduct" or that they controlled the "specific policies" at issue).

[30] In *Alna Associates*, the Eleventh Circuit noted that the scienter requirement is less stringent under Florida statutory and common law.  758 F.2d at 565 n.6.  However, that distinction is of no consequence here, where Plaintiffs have not even pled facts showing that Defendants acted negligently.  *See* § VII(D) *supra*; n.30 *infra*.

IX.    **The Complaint Fails to State a Claim Based on Fla. Stat. §§ 517.301 and 517.221 Upon Which Relief may be Granted (Count 11).**

Plaintiffs allege that the BSI, SBT, OIS, Sanchez Castillo and Jaureguizar violated the Florida Securities Investors Protection Act, Fla. Stat. Ann. § 517.301 ("FSIPA"), which prohibits fraudulent schemes, statements and practices in connection with the purchase or sale of any security.  The elements a plaintiff must plead under § 517.301 to survive a motion to dismiss are "nearly identical" to those under federal securities laws.  *Ward v. Atlantic Sec. Bank*, 777 So.2d 1144, 1147 (Fla. Dist. Ct. App. 2001).  Thus, to state a claim under this provision, Plaintiffs must allege: (1) a misrepresentation or omission of a material fact; (2) justifiably relied upon; (3) made in connection with a purchase or sale of securities; (4) with scienter; and (5) that the untruth was the cause of the loss.  *In re Sahlen & Assoc., Inc. Sec. Litig.*, 773 F. Supp. 342, 371 (S.D. Fla. 1991).  Due to close similarities in the pleading standards required by federal and Florida securities fraud provisions, as well as the fact that Florida courts generally look to federal case law in deciding cases brought under FSIPA, the arguments set forth above in the context of Plaintiffs' federal securities law claims apply equally here.  *See* §VII(C)-(F) *supra*; *see also Ward*, 777 So.2d at 1147 ("Florida courts will look to interpretations of the federal securities for guidance in interpreting Florida's securities laws.").[31]

In at least one respect, however, FSIPA is much more restrictive than its federal counterpart:

---

[31] Notably, FSIPA requires that a plaintiff allege only that the defendant acted negligently, while the federal scienter standard requires allegations of recklessness.  *See Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046 (11th Cir. 1987).  For purposes of this brief, however, the distinction is immaterial, since Plaintiffs cannot even allege that Defendants acted negligently.  (*See supra* § VII(D))  Indeed, Defendants' statements that they were engaged in due diligence and that Madoff custodied the Funds' assets cannot be said to be negligent in light of the competing inferences.  (*See supra id.* ("[T]he allegations all attest to the uniform, albeit honestly mistaken, understanding of Defendants and their agents and employees that Madoff was a legitimate broker-dealer.  Similarly, the very allegations that Plaintiffs advance in an effort to show that Defendants' due diligence efforts were not adequate, overwhelmingly show that OIS was in fact performing extensive, expensive, on-site due diligence.").)

> Rule 10b-5 is wide-ranging, covering a broad spectrum of fraud.  It applies to any person who is deceitful in connection with the purchase or sale of securities.  It requires no privity between buyer and seller….[FSIPA] applies to a far more narrow group of activities than does rule 10b-5.  Buyer/seller privity is required.

*E.F. Hutton & Co. v. Rousseff*, 537 So.2d 978, 981 (Fla. 1989).  Thus, to plead a successful claim under FSIPA, a complaint must allege buyer/seller privity.  Privity allegations will succeed if they show either (1) the plaintiff bought the security directly from the defendant; or (2) the defendant is an agent of the seller who personally participated in the transaction by actively soliciting the sale of the securities at issue and that the solicitation was motivated by a desire to serve his or her own financial interests.  *In re Sahlen*, 773 F. Supp. at 372 & n.40; *Hillard v. Black*, 125 F. Supp. 2d 1071, 1083 (N.D. Fla. 2000).  Courts addressing privity in the context of FSIPA have reasoned that the federal standard for privity under Section 12(a)(2) of the 1933 Act, as announced by the Supreme Court in *Pinter v. Dahl*, 486 U.S. 622 (1988), is the standard applicable to privity determinations under FSIPA.  *In re Sahlen*, 773 F. Supp. at 372 n.40.

Plaintiffs here do not allege that they bought the securities from BSI.  Nor do Plaintiffs allege that BSI or its agents acted as a broker for the seller (here, the Funds) in the transaction that resulted in the acquisition of shares in SUS and Arbitrage.  Indeed, although Plaintiffs state that "Defendants then directed the completion or completed the transactions from Santander Miami's offices" (Amd. Compl. ¶ 435), merely facilitating a transaction does not raise BSI to the level of a broker aligned with a seller.  *See Beltram v. Shackleford, Farrior, Stallings & Evans*, 725 F. Supp. 499, 500 (M.D. Fla. 1989) (denying summary judgment because "as a matter of law, Defendant is not a seller of the securities at issue, or an agent of the seller").  Rather, the Complaint makes clear that Plaintiffs viewed BSI and its agents as Plaintiffs' investment adviser.  (*See* Amd. Compl. ¶¶ 45, 53, 58, 126.)  Case law following *Pinter*'s definition of buyer-seller privity makes clear that investment advisers like BSI do not qualify as agents actively involved in the solicitation of securities and are thus not in "privity" with buyers.  *See, e.g.*, *Poole v. Frank*, Civ. No. 88-737-MA, 1990 WL 267360, at *3 (D. Or. Oct. 31, 1990) (holding that an

investment advisor is not in privity with his client because "any solicitation on the part of [the advisor] was complete upon the execution of the investment advisor agreement").

The FSIPA allegations regarding OIS and SBT are even more attenuated. The Complaint does not make a single allegation that either entity participated in the transactions at issue. *See Dillon v. Axxsys Int'l, Inc.*, 185 Fed. Appx. 823, 828 (11th Cir. 2006) ("The law requires some personal activity and involvement in the sale."). Equally important, those Defendants' status as—at most—a fund manager and a custodian simply do not rise to the level necessary to demonstrate the buyer-seller privity required by FSIPA. *Pinter*, 486 U.S. at 647 ("[L]iability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."); *Allison v. Bankone-Denver*, Civ. A. Nos. 91-s-1422, 91-S-1423, 1994 WL 637403, at * 3 (D. Colo. Jan. 7, 1994) (finding that a custodian did not qualify as a "seller" because it did not receive any additional fee for accounts holding the type of security at issue).

## CONCLUSION

For all the reasons set forth above, Defendants respectfully request that this Court dismiss the Complaint it its entirety.

Dated:  September 30, 2010

Respectfully submitted,

**HUNTON & WILLIAMS LLP**
*Counsel for Banco Santander, S.A., Banco Santander International, Santander Bank & Trust, Ltd., Optimal Investment Services, S.A., Manuel Echeverría Falla, Manuel Sanchez Castillo and Ana Maria Jaureguizar*
Mellon Financial Center
1111 Brickell Avenue, Suite 2500
Miami, FL  33131
Telephone:      (305) 810-2500
Facsimile:       (305) 810-2460
By:  /s/Gustavo J. Membiela
    Samuel A. Danon
    Florida Bar No.: 892671
    Gustavo J. Membiela
    Florida Bar No.: 513555
    Paulo R. Lima
    Florida Bar No.: 0064364

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that, on September 30, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record listed below:

<u>**PLAINTIFF'S COUNSEL**</u>**:**

Martin B. Goldberg
Lawrence Brett Lambert
Lash & Goldberg
100 SE 2nd Street
Suite 1200
Miami, FL 33131-2100

      /s/Gustavo J. Membiela
For Hunton & Williams LLP

- 41 -