# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA
# 1:10-cv-20695-CIV-Moreno

| | |
|---|---|
| SOLYMAR INVESTMENTS, LTD, et. al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) |
| | ) |
| BANCO SANTANDER S.A., et. al, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Samuel A. Danon
(Florida Bar No. 892671)
Gustavo J. Membiela
(Florida Bar No. 513555)
Paulo R. Lima
(Florida Bar No. 0064364)
**HUNTON & WILLIAMS LLP**
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Tel: (305) 810-2500
Fax: (305) 810-2460
Email: sdanon@hunton.com
Email: gmembiela@hunton.com
Email: plima@hunton.com

*Attorneys for Defendants*

November 15, 2010

Defendants respectfully submit this Reply Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint [D.E. #46].

## I. Plaintiffs Lack Standing to Bring Direct Claims for Breach of Fiduciary Duty, Gross Negligence, Negligence and Unjust Enrichment.

By focusing only on the choice of law that governs the substance of their direct tort claims, Plaintiffs ignore the law that governs whether they have standing to bring these claims. Because that question implicates the relationship between a corporation (Multiadvisors) and its shareholders — *i.e.*, the corporation's "internal affairs"— the law of the state of incorporation governs. *See, e.g.*, *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989).

The internal affairs doctrine governs because "[t]he choice between derivative and direct litigation is a choice about how (and by whom) the internal affairs of the firm are managed." *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir. 1990). Thus, the law of the Bahamas governs whether Plaintiffs have standing to bring their common law claims.[1]

Following *Foss v. Harbottle* and the Principle of Reflective Loss, Bahamian law precludes Plaintiffs, as shareholders, from bringing common law claims that the Funds can bring.[2] (Mot. 6-7; Hildyard Decl. ¶ 29.) Specifically, where, as here, the alleged tortious conduct — mismanagement of Fund assets — was committed against the Funds themselves, and the only loss being claimed is each Plaintiff's portion of the decline in the value of the Funds' assets, such claims may be brought, if at all, only by or on behalf of the Funds.[3] (*Id.*)

---

[1] *See, e.g.*, *U.S. Med. Neuroscience Invs., L.L.C. v. Morton Plant Hosp. Ass'n*, No. 8:09-cv-464, 2009 WL 1651424, at *2 (M.D. Fla. June 12, 2009) ("In determining whether the claims at issue in this case are derivative or direct claims, this Court must apply the law of the state of [incorporation].").

[2] The Declaration of Roy Sweeting, which Plaintiffs submit in support of their interpretation of Bahamian law, conceded that *Foss v. Harbottle* is "part of Bahamian common law." (Sweeting Decl. at 8.).

[3] Plaintiffs' expert suggests the Investment Funds Act of 2003 ("IFA") reflects a possible source of direct liability on the part of service providers to individual fund investors. (Sweeting Decl. at 8-9.) But these Regulations do not create any independent cause of action. (Hildyard Supp. Decl. ¶ 10.) Rather, they at most reflect an attempt by Bahamian Parliament to preserve "pre-existing" direct liability, such as, for example, fraud liability. (Hildyard Supp. Decl. ¶ 10.) As Mr. Hildyard explains, a finding of potential liability here would directly contravene common law principles disfavoring such a scheme of parallel shareholder rights. (*Id.*)

Plaintiffs argue that shareholders may bring a direct claim "for injuries suffered individually by investors which are separate and distinct from that suffered by the entities in which they invested." (Opp. 6.) This principle simply reaffirms the conclusion that Plaintiffs' claims for mismanagement of Fund assets may not be brought directly. Indeed, as Defendants explained in their opening brief (Mot. 7-9), the case law clearly distinguishes between claims "based on [plaintiffs'] own reliance on fraudulent statements and misrepresentations made to them" and claims based on mismanagement where plaintiffs "retain the same opportunity to be made whole by a corporate recovery from the wrongdoer as do all the other similarly situated investors." *See Medkser v. Feingold*, 307 F. App'x 262, 265 (11th Cir. 2008).[4]

Plaintiffs concede that their common law claims are not based on misrepresentations. (*See, e.g.*, Amd. Compl. ¶¶ 359-60.) Rather, they claim Defendants failed adequately to supervise the investment of the Funds' assets, thus resulting in the loss of those assets. (*See, e.g.*, Amd. Compl. ¶ 367.) Unlike claims based on misrepresentation and fraudulent inducement, which involve individualized injuries to shareholders, these claims "based on breach of fiduciary duty, corporate mismanagement or third party action that result in the diminution of share value belong to the corporation and can only be brought by it or a shareholder suing derivatively." *Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 444 (2d Cir. 2008).[5]

Plaintiffs cite *Anwar v. Fairfield Greenwich Ltd.*, 09-CIV-0118, 2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010), but fail to acknowledge that *Anwar* is an outlier. Four other courts overseeing Madoff feeder fund cases have dismissed similar common law claims for lack of

---

[4] The cases relied upon by Plaintiffs reaffirm that the duties alleged were not independent of those owed to the Fund, as the independent duties relied upon in those cases were based on the defendants' "obligation to make full disclosure to [plaintiff]." *See, e.g., Solutia, Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 333 (S.D.N.Y. 2005).

[5] Plaintiffs' argument that the fund "was nothing more than a shell used solely to feed investors' funds into the Madoff Ponzi scheme" (Opp. 7) was rejected by other courts in similar cases. *See, e.g., In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 463 (D.N.J. 2005) (a mutual fund "is merely a vehicle by which investors pool their money in a company to realize a financial gain and, therefore, any injury to the pool of money is not an injury to the fund, but to the investors directly"); *see also In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *6 (S.D.N.Y Jan. 17, 2006).

standing to pursue derivative claims.[6] Moreover, *Anwar* did not discuss whether the shareholder plaintiffs "can prevail without showing any injury to the corporation," *Tooley v. Donaldson, Lufkin & Jenrete, Inc.*, 845 A.2d 1031, 1039 (Del. 2004), a critical factor in deciding whether a claim is direct or derivative. *Medkser*, 307 F. App'x at 265 ("A claim may be brought in a direct action…where the injury…is separate and distinct from *injuries sustained by the corporation and all other shareholders equally*.") (emphasis added).

## II. Plaintiffs Have Not Shown the Existence of a Duty to Support Their Claims for Negligence, Gross Negligence and Breach of Fiduciary Duty.

Plaintiffs focus on whether a "fiduciary duty" is necessary to give rise to claims for gross negligence and negligence. (Opp. 8.) However, Defendants' argument is that those three Defendants did not owe *any* duty to Plaintiffs. In contrast to BSI and the individual BSI employee Defendants ― each of whom is alleged to have dealt directly with Plaintiffs ― none of the remaining Defendants had sufficient contact with Plaintiffs to create a duty. (Mot. 10.)

With respect to Santander Spain, the only direct contact alleged is the "issuance of a Comfort Letter to Plaintiffs." (Opp. 9.) But the letter merely confirmed that (i) SBT was an indirect affiliate, (ii) Santander Spain expected SBT to remain solvent, and (iii) Santander Spain would inform Plaintiffs in the event of a change in ownership of SBT. (Amd. Compl. ¶ 51.) In short, the letter had nothing to do with managing the investment relationship, a task that Plaintiffs allege was conducted "exclusively by employees, officers and/or directors of Santander Miami." (Amd. Compl. ¶ 19.) Thus, the plain language makes clear the letter was not an "undertaking by [Santander Spain] to advise, counsel, and protect [Plaintiffs]," as required to create a fiduciary duty, *Lanz v. Resolution Trust Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 2003), nor did it create a "foreseeable zone of risk" as to Plaintiffs, as required to trigger an ordinary duty of due care, *Fla. Power & Light Co. v. Pereira*, 705 So.2d 1359, 1361 (Fla. 1998).

Plaintiffs allege that OIS's duty of care is based on promises concerning diligence (Opp. 10), which were made in Explanatory Memoranda ("EMs"), internal presentations and Due Diligence Questionnaires. This argument is directly contradicted by the Amended Complaint,

---

[6] *See, e.g., West Palm Beach Police Pens. Fund v. Collins Cap. Low Volatility Performance Fund*, 09-80846-CIV, 2010 WL 2949856, at *3 (S.D. Fla. July 26, 2010); *Newman,* 2010 WL 4118083, at *12; *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 610 (S.D.N.Y. 2010); *Goldweber v. Harmony Partners, Ltd.*, 09-61902-CIV, 2010 WL 3702508, at *4 (S.D. Fla. Sept. 16, 2010).

which repeatedly alleges that OIS *failed to provide* prospectuses or any other relevant materials to Plaintiffs. (Amd. Compl. ¶¶ 108, 111.) If Plaintiffs were not aware of these statements at the time they invested, they cannot give rise to a duty of care, as they cannot have created a "foreseeable zone of risk" as to Plaintiffs. *Pereira*, 705 So.2d at 1361.[7] As to Echeverría, Plaintiffs have not alleged any facts creating a duty other than his position as an officer of OIS.

## III. Plaintiffs' Aiding and Abetting Claims Fail as a Matter of Law.

Plaintiffs fail to identify any conduct by Santander Spain that would show Santander Spain rendered "substantial assistance or encouragement" to other Defendants. In *Court-Appointed Receiver of Lancer Mgmt. Corp. v. Lauer*, the Court noted that substantial assistance may be satisfied by showing conscious intent, which in turn, can be inferred in a "transaction which is atypical or lacks business justification." No. 05-60584-CIV, 2010 WL 1372442, *4 (S.D. Fla. Mar. 31, 2010). However, Plaintiffs' alleged basis for "substantial assistance" is nothing more than a list of routine activities performed by any corporate parent whose affiliates are engaged in providing investment advisory and banking services. (*See* Opp. 12.)

## IV. Santander Spain Cannot be Held Liable Under *Respondeat Superior*.

Despite alleging in the Amended Complaint that Santander Spain was liable as to counts 1, 3-5, 7-8 under the doctrine of "*respondeat superior*," Plaintiffs now assert that those claims are based on alter ego and "direct liability." (Opp. 12-13.) But Plaintiffs have not alleged, nor could they, that the Defendant subsidiaries were "mere devices" or "sham" entities without any separate legitimate purpose. Thus, the allegations are plainly insufficient. *Johnson Enters's of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998) (to show liability of a corporate parent, plaintiff must show that the subsidiary was "a mere device or sham to accomplish some ulterior purpose"). To the extent that Plaintiffs allege Santander Spain is directly liable for the torts alleged, their claims fail for the reasons discussed elsewhere in this Reply (*e.g.*, lack of standing, lack of duty, economic loss doctrine, exculpatory provisions).

## V. Plaintiffs' Tort Claims are Barred by the Terms of the Contractual Agreements Governing Their Accounts.

Plaintiffs' argument that their account agreements with SBT do not govern their tort claims ignores the plain language of those agreements. Plaintiffs attempt to re-label the

---

[7] Plaintiffs also allege that OIS's (and Echeverría's) "superior position" created fiduciary duties. (Opp. 10.) However, this is also insufficient. *See Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group, Ltd.*, 2008 WL 926513, *4 (S.D. Fla. Mar. 31, 2008).

agreements "account opening statements", and argue that they "merely address the custodial relationship…not the investment advisory services." (Opp. 13.) But this is simply incorrect, as the exculpatory provision expressly covers precisely the type of losses that are the subject of this action. (*See* First Amd. Terms & Conditions § 48 (exculpating liability for losses sustained "by reason of declines in the market value of property in the accounts or for losses incurred upon the purchase, retention, sale, *management*, or *administration* of such property") (emphasis added).)

The exculpatory provision excludes liability for acts taken in good faith and which "are not the result of Bank's duties under this agreement." (*Id.*) Plaintiffs have not alleged that Defendants acted in bad faith. Nor have they identified any duty under the Terms & Conditions that was breached by Defendants. (Mot. 14-15.) In fact, Plaintiffs have argued that their claims "arise from duties and actions undertaken outside the scope of the Account Opening Statements." (Opp. 13.) As such, the exculpatory provision effectively bars Plaintiffs' tort claims.

## VI. Plaintiffs Have Not Stated a Claim for Unjust Enrichment.

Plaintiffs contend they have sufficiently alleged that they conferred a "direct benefit" on Defendant OIS. However, the cases they cite for this proposition are distinguishable in that both involved plaintiffs who purchased products from retailers who, in turn, directly passed the benefit onto the manufacturer defendants. (Opp. 11 (citing *Romano v. Motorola, Inc.*, 2007 WL 4199781 (S.D. Fla. Nov. 26, 2007) (cellular phones) and *MacMorris v. Wyeth, Inc.*, 2005 WL 1528626 (M.D. Fla. June 27, 2005) (prescription drugs)).) Here, by contrast, Plaintiffs owned shares of the Fund, which, in turn, entered into a separate contract whereby it agreed to pay OIS a management fee that depended on the various factors including the total amount of assets under management and the Fund's performance. Plaintiffs also argue that whether BSI and SBT were unjustly enriched presents a fact question not appropriate for resolution on a motion to dismiss. (Opp. 11.) However, courts have dismissed unjust enrichment claims where the pleadings and materials properly considered demonstrate that a plaintiff received the benefit for which it paid. *See Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1369 (S.D. Fla. 2007)[8]

---

[8] The unjust enrichment claim fails for the additional reason that Plaintiffs' account relationships are governed by express contracts — *i.e.*, the First Amended Terms & Conditions with SBT. (*See* Mot. 17.) Plaintiffs have not contested this argument in their Opposition.

**VII. Plaintiffs Have Not Stated Federal Securities Law Claims.**

    **A.    Plaintiffs have not alleged a domestic securities transaction.**

Since *Morrison v. Nat'l Australia Bank, Ltd.*, 130 S.Ct. 2869 (2010), courts have recognized that the Supreme Court crafted a "new bright-line transactional rule embodying the clarity, simplicity, certainty and consistency that the [conduct and effects test] lacked." *Cornwell v. Credit Suisse Group*, 2010 WL 3069597, *3 (S.D.N.Y. July 27, 2010). *Morrison* made clear, once and for all, that courts are not to engage in fact-intensive analyses of securities transactions in search of territorial links to the U.S.; instead, the new test asks only whether: (1) the relevant security is listed on a U.S. exchange, or (2) if there has been a "domestic transaction" (*i.e.*, the relevant security was purchased or sold in the United States). *Morrison*, 130 S.Ct. at 2884. As explained in Defendants' Motion, Plaintiffs purchased shares of Optimal Multiadvisors ― which they concede was not listed on a U.S. exchange ― in a transaction that occurred *in Ireland*. (Mot. 19-22.) As such, Plaintiffs cannot state claims under federal securities law.

The U.S. contacts that Plaintiffs list in their Opposition are irrelevant under current law. (*See, e.g.*, Opp. 15 ("Plaintiffs sent their initial orders…to Santander Miami's office"); *id.* (investment order confirmations were "prepared by Defendant Jaureguizar in Miami"); *id.* (Plaintiffs sent order confirmations to Miami "to complete the transactions"); *id.* (OIS "maintained offices and personnel in New York" and "the New York offices received trade confirmations directly from Madoff").) Courts have recognized that, post-*Morrison*, such contacts do not transform a purchase into a domestic securities transaction. *See Cornwell*, 2010 WL 3069597, *3 ("[T]o carve out of the new rule a purchase or sale of securities because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more that the reinstatement of the conduct test."); *In re Societe Generale Sec. Litig.*, 2010 WL 3910286, *6 (S.D.N.Y. Sept. 29, 2010) ("By asking the Court to look to the location of 'the act of placing a buy order,' and to 'the place of the wrong,' Plaintiffs are asking the Court to apply the conduct test specifically rejected in *Morrison*.").

Plaintiffs further contend there has been a domestic transaction based on several "order confirmations," which they attach to the Opposition, purportedly showing that shares of Optimal SUS and Arbitrage were bought in New York. (Opp. Exh. B.) Their argument misunderstands the mechanics of the share purchase process. The security purchased by Plaintiffs was Optimal Multiadvisors Ltd., of which SUS and Arbitrage were sub-funds or "series." (Mot. 20-21.)

Furthermore, as stated in the June 2004 EM, "potential shareholders…must submit the necessary subscription documents for investment *into a specified series*." (EM 16 (emphasis added).) Thus, a purchase was completed, and shares issued, only after the Fund Administrator in Dublin, Ireland, received and accepted a signed subscription form indicating which series of Multiadvisors a potential investor wished to purchase. (Mot. 21.)

Next, Plaintiffs argue that they never received the June 2004 EM. (Opp. fn.12.) But even assuming *arguendo* that Plaintiffs did not receive any EMs, this does not alter the fact that Plaintiffs became owners of their shares only after the Fund Administrator *in Ireland* received and accepted the completed subscription forms. As such, Plaintiffs have not identified a proper basis for deeming their purchases "domestic transactions."[9]

Finally, the Court should ignore Plaintiffs' attempt to marginalize Judge Huck's opinion in *In re Banco Santander Securities-Optimal Litig*. While Plaintiffs dismiss its discussion of *Morrison* as mere "dicta" (Opp. 16), Judge Huck presided over that case — which involved the same allegedly fraudulent conduct by the same corporate defendants in the same investment funds — for well over a year, giving him a proper basis on which to rule that the case simply did not involve domestic securities transactions. This Court should reach the same conclusion.

### B. Plaintiffs have not pled the elements of federal securities claims.

#### 1. The complaint fails to allege facts permitting a strong inference of scienter.

Plaintiffs allege that, despite conducting extensive due diligence (*see, e.g.,* Amd. Compl. ¶¶ 209, 214, 216, 218, 250-53), and supposedly coming within a "simple phone call" of uncovering the truth (*id.* ¶ 204, Opp. 23), Defendants "knowingly ducked their due diligence obligations" or "intentionally failed to disclose the unpleasant truth" of Madoff's fraud. Plaintiffs' theory — that Defendants were on the cusp of discovering the truth about Madoff but affirmatively chose not to — is in fact the *least plausible* inference. As Defendants explained in the Motion, other far more plausible explanations exist for why Defendants, despite conducting due diligence in good faith, did not realize that BMIS was a fraud. (*See* Mot. 24-28.) Indeed, until Madoff confessed that his money management operation was a "giant Ponzi scheme"

---

[9] Additionally, Plaintiffs' reliance on *Anwar v. Fairfield Greenwich Ltd.*, 2010 WL 3341636 (S.D.N.Y. Aug. 18, 2010), is misplaced. (Opp. 16.) In *Anwar*, the "subscription agreements were accepted by the funds, and [] this approval occurred *in New York City*." 2010 WL 3341636, at *18 (emphasis added).

(Amd. Compl. ¶ 179), *no one* — including the SEC and FINRA, who were charged with examining, and did in fact examine, his operations on several occasions — uncovered the fraud.

With the benefit of hindsight, Plaintiffs cite several supposed "red flags" that they allege should have alerted Defendants to Madoff's fraud. (*See e.g.*, Amd. Compl. ¶¶ 208-237.) But Plaintiffs cannot explain why those same clues, which were available to the entire investment community, including regulators, did not expose the fraud before Madoff confessed. Plaintiffs ignore Defendant's discussion of *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405 (S.D.N.Y. 2007), in which the district court dismissed a complaint alleging that defendants misrepresented the due diligence they performed on a hedge fund that turned out to be a massive Ponzi scheme. There, the court held that the "inference proposed by [plaintiffs] is thus not 'strong in light of other explanations,'" and dismissed the complaint for failure to plead scienter. *Id.* at 418.

"[C]ourts considering similar red flag allegations in the aftermath of the Madoff affair have found [that] Plaintiffs' allegations are insufficient to establish scienter." *Newman v. Family Mgmt. Corp.*, 08-Civ.-11215, 2010 WL 4118083 at *8 (S.D.N.Y. Oct. 20, 2010); *see also In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (finding the "more compelling inference" to draw from plaintiffs' allegations was that Madoff was "proficien[t] in covering up his scheme and eluding the SEC and other financial professionals"); *SEC v. Cohmad Secs. Corp.*, 09-Civ.-5680, 2010 WL 363844 at *2 (S.D.N.Y. Feb. 2, 2010) (dismissing complaint for failure to plead scienter because "nowhere does [it] allege any fact that would have put defendants on notice of Madoff's fraud"). This Court should do likewise.

### 2. The Amended Complaint does not allege actual reliance with adequate particularity.

Plaintiffs make no attempt to demonstrate that they adequately allege reliance on Defendants' purported misrepresentations. Rather, Plaintiffs contend only that they face no such pleading burden because their Complaint alleges primarily omissions, rather than affirmative misrepresentations. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) (reliance presumed when alleged misrepresentations are primarily omissions). (Opp. 23-24.) But the alleged misrepresentations are affirmative misstatements rather than omissions (*see, e.g.*, Amd. Compl. ¶ 455), and Plaintiffs fail in their attempt to resist their characterization as such. For example, the Amended Complaint alleges that Defendants "misrepresent[ed] that they…were conducting extensive due diligence and monitoring Madoff's operations" (Amd. Compl. ¶ 455(g)), but Plaintiffs now claim that this alleged misrepresentation is actually an

omission — "the failure to disclose the truth about the lack of due diligence performed" (Opp. 24). This is wordplay. At most, the Complaint alleges "mixed claims of misrepresentations and omissions"; thus the *Affiliated Ute* presumption does not apply. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987).

### 3. Plaintiffs fail to allege loss causation.

Plaintiffs acknowledge that they have not pleaded that the alleged failure to disclose that BSI was prohibited from selling Optimal SUS and Arbitrage caused them any loss within the meaning of the requirement of loss causation in fraud cases. (Opp. 26 n.26.) Rather, Plaintiffs argue that Defendants' alleged misrepresentations as to "the quantity and quality", "volatility", and diversification of the investments, and the adequacy of the "due diligence conducted by OIS", "directly led to Plaintiffs' losses." (Opp. 26.) Plaintiffs claim that, if those misrepresentations had not been made, "[they] would not have made the investment and subsequently lost [it]." (*Id.*) Plaintiffs appear to confuse "transaction causation" (*i.e.*, that the misrepresentations or omissions caused the plaintiff to engage in the transaction) with "loss causation" (*i.e.*, that the untruth was the proximate cause of their loss).

Plaintiffs fail to plead loss causation because they never explain *how* any of these alleged misrepresentations or omissions caused their losses. *See Robbins v. Koger Props.*, 116 F.3d 1441, 1447 (11th Cir. 1997) ("If the investment decision is induced by misstatements or omissions…but are not the proximate reason for [a plaintiff's] pecuniary loss, recovery under the Rule is not permitted."). It is undisputed that Plaintiffs' losses ultimately were caused directly by Madoff's fraud, rather than by any alleged conduct by the Defendants. Put differently, Plaintiffs' losses were proximately caused by Madoff's failure to invest their money in and hold securities, not by Defendants' alleged misrepresentations to Plaintiffs.

### 4. Plaintiffs have not stated a claim for Section 20(a) liability.

Plaintiffs' Section 20(a) claim fails, first, because the primary Section 10(b) claim fails. (Mot. 34-36.) Plaintiffs also have not alleged facts demonstrating that Santander Spain and Echeverría "had the power to control the general affairs of [the alleged primary violators] at the time the entity violated the securities laws…and had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1279 (S.D. Fla. 2008). Plaintiffs allege a slew of facts demonstrating that Santander Spain was familiar with OIS's efforts to sell the

Funds, was aware that those effort were profitable, and was even familiar with OIS's efforts to conduct due diligence related to the fund. (Opp. 27.) But these are merely the hallmarks of a standard corporate parent-subsidiary relationship and, without more, do not show that Santander Spain controlled (or had the power to control) the decisions and those affiliates' policies that allegedly resulted in primary liability. As for Echeverría, the fact that he was a director and chief executive officer of OIS does not show that he was able to control the company's specific policies concerning the conduct that allegedly resulted in the primary violation.

## VIII. Plaintiffs Fail to State a Claim Under Florida Securities Law.

Plaintiffs' claims under the Florida Securities Investors Protection Act, Fla. Stat. Ann. § 517.301 ("FSIPA") should be dismissed for two reasons. First, even though FSIPA permits a plaintiff to allege that the defendant acted negligently (rather than recklessly), Plaintiffs' allegations do not meet even this lesser standard. As discussed above in connection with Plaintiffs' federal claims, the more compelling inference to be drawn from Plaintiffs' allegations is that Defendants conducted adequate due diligence and honestly believed that Madoff was a legitimate broker-dealer, but that Madoff effectively hid his scheme from them, as he did from everyone else.[10]

Second, the Complaint does not adequately allege privity — *i.e.*, that Plaintiffs purchased the securities at issue from Defendants, or that any Defendant is an agent of the seller. *See In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 372 & n.40 (S.D. Fla. 1991) (noting requirement of privity under FSIPA). Although Plaintiffs assert the Amended Complaint states that SBT and OIS "offered and solicited the sale of Optimal SUS and Arbitrage to Plaintiffs" (Opp. 28), none of the paragraphs to which they cite alleges that. As to Defendants BSI, Jaureguizar and Sanchez Castillo, Plaintiffs' arguments similarly fail. Plaintiffs characterize those Defendants as mere "investment advisers" for Plaintiffs, not as sellers or selling agents. (*See, e.g.,* Amd. Compl. ¶¶ 13, 52-53, 97, 119, 148.)

## IX. Conclusion

For all the reasons set forth above, Defendants respectfully request that this Court dismiss the Amended Complaint it its entirety.

---

[10] Because the standard for scienter is the same under Florida common law as it is under the FSIPA, Plaintiffs' common law fraud claim (count 10) should be dismissed for this same reason. *See Alna Capital Assocs. v. Wagner*, 758 F.2d 562, 565 n.6 (11th Cir. 1985).

Dated: November 15, 2010

        Respectfully submitted,

        **HUNTON & WILLIAMS LLP**
        1111 Brickell Avenue, Suite 2500
        Miami, FL 33131
        Telephone: (305) 810-2500
        Facsimile: (305) 810-2460
        Email: sdanon@hunton.com
        Email: gmembiela@hunton.com
        Email: plima@hunton.com

        By: /s/Gustavo J. Membiela
            Samuel A. Danon
            Florida Bar No.: 892671
            Gustavo J. Membiela
            Florida Bar No.: 513555
            Paulo R. Lima
            Florida Bar No.: 0064364

*Counsel for Banco Santander, S.A., Banco Santander International, Santander Bank & Trust, Ltd., Optimal Investment Services, S.A., Manuel Echeverría Falla, Manuel Sanchez Castillo and Ana Maria Jaureguizar*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 15, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to counsel of record listed below:

**PLAINTIFF'S COUNSEL:**

Martin B. Goldberg
Lawrence Brett Lambert
Lash & Goldberg
100 SE 2nd Street
Suite 1200
Miami, FL 33131-2100

      /s/Gustavo J. Membiela
      For Hunton & Williams LLP