# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 10-20695-CIV-MORENO/TORRES

SOLYMAR INVESTMENTS, LTD, et. al,

      Plaintiffs,

vs.

BANCO SANTANDER S.A., et. al,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court Defendants' Motion to Dismiss Complaint [D.E. 15] based on a written agreement between the Parties that incorporated Arbitration and Forum Selection provisions. The Court has reviewed the motion, Plaintiffs' response, the reply, the relevant authorities submitted by the parties, and the record in the case. For the following foregoing reasons the Defendants' Motion to Dismiss should be Granted and the action Dismissed.

### *I. BACKGROUND*

The following summary of factual allegations is taken from Plaintiffs' amended complaint [D.E. 27] and is deemed true for purposes of this motion. The named Plaintiffs in this case, Solymar Investments, Ltd., Astrolite Investments, Ltd., Eternalite Investments, Ltd., and Sunrays Investments, Ltd., are personal investment holding companies organized under the laws of Cayman Islands. [D.E. 27 ¶ 7]. The two

individuals shareholders are citizens and residents of the Republic of Panama.  [*Id.*].  Plaintiffs were clients of Coutts & Co. (Cayman) Ltd. ("Coutts Cayman"), which was then owned by Royal Bank of Scotland ("RBS").  [D.E. 27 ¶ 15].

On May 13, 2003, Banco Santander, S.A. ("Santander Spain") purchased the Miami-based Latin American private banking operations of the Coutts Group from RBS. [D.E. 27 ¶ 41].  As a result, Ana Maria Jaureguizar [D.E. 27 ¶ 24], the Plaintiffs' account representative who worked at Coutts Miami, became an officer and employee of Santander Spain as a result of the acquisition.  [D.E. 27 ¶ 41-42].  Although, Coutts Cayman was not part of the sale, Jaureguizar, now acting in the interests of Santander, allegedly represented to Plaintiffs that Coutts Cayman had sold all its Latin American operations to Santander, and as a result it would no longer be able to serve Plaintiffs' accounts [D.E. ¶ 43].  Plaintiffs then decided they would negotiate with Santander Miami (for advisory services) and Santander Bahamas (for custodial services), but would not transfer their assets to Santander Bahamas until a formal agreement was finalized. [D.E. 27 ¶ 45].  The Court will refer to these Santander entities collectively as "Santander."

During the negotiation period, Defendants promoted low risk investments that, unknown to Plaintiffs, were not low risk, low volatility and fully diversified. [D.E. 27 ¶ 84].  Based on Defendants' reassurances, on March 16, 2005, Plaintiffs opened accounts with Santander Bahamas. [D.E. 27 ¶ 95] and in April 2005, Plaintiffs transferred a substantial amount of funds to their new accounts at Santander Bahamas, following which Plaintiffs accepted Santander Miami's offers and investment

recommendations based on the quantitative analysis and representations as to the low risk, low volatility and diversification of the investments offered by Santander. [D.E. 27 ¶ 104].

This lawsuit arose, however, when much of Plaintiffs' monies were invested by Santander, negligently and in breach of Santander's fiduciary duties to Plaintiffs, in investments managed by former NASDAQ executive Bernard Madoff, who was operating an extensive fraudulent ponzi scheme with those funds. The ponzi scheme allegedly continued until such time as requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the Ponzi scheme to collapse. Although the Madoff scheme was shut down at that time, which led to Madoff pleading guilty to fraud on federal criminal charges, Plaintiffs allege that they, along with many other similar investors, lost a significant amount of money, which losses would not have occurred but for Santander's facilitation of the Madoff fraud. Plaintiffs allege that Santander failed to exercise adequate due diligence, despite the existence of obvious "red flags" that did or reasonably should have revealed the fraudulent nature of Madoff's operations. This was the case despite the fact that Santander agents and employees touted themselves as highly skilled and professional investment advisers and investment fund managers.

Notwithstanding those allegations, and indeed because of the discovery of the Madoff ponzi scheme, the parties entered into negotiations over their investment relationship. An Exchange Agreement [D.E. 15-1] was executed in March 2009 after the investment accounts at issue had been suspended in connection with the Madoff ponzi scheme investigation. The exchange referred to in the agreement was the

exchange of the suspended Madoff-invested accounts for preferred securities with Santander (as described in the agreement and annexed thereto).  As consideration for the exchange of shares, the client agreed in the body of the agreement to release Defendants from any liability arising from the investments, arbitrate any issues under the agreement applying the law of the Bahamas, confer jurisdiction to enforce the agreement on the courts in Geneva, Switzerland, and maintain the agreement confidential.   The agreement also included an integration clause (¶4.3) that memorialized the parties' understanding that the document was "the entire agreement" between the parties regarding its subject matter, that it "supersedes all prior agreements, arrangements or understandings between the Parties," and that "[n]o oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist."

Nevertheless, Plaintiffs contend that no binding agreement ever materialized. Plaintiffs claim they accepted the Exchange Agreement only as part of a comprehensive settlement, which included a proposed non-recourse Note and Pledge Agreement using the preferred shares issued pursuant to the Exchange Agreement as the sole security for the principal of the Note.   The Exchange Agreement was purportedly nothing more than a device to allow the Bank to issue preferred shares that would be security for a non-recourse "loan" (i.e., the settlement payment) made to Plaintiffs to refund their Madoff losses without impacting the Bank's capital ratios or existing shareholders.

Plaintiffs conclude that only upon agreement, execution, and funding of the Note and Pledge Agreement would the Proposed Settlement Agreement, including the

Exchange Agreement, become a validly formed contract. Plaintiffs claim they rejected the Exchange Agreement as a stand-alone contract, both orally and in writing. After having rejected the Exchange Agreement as a stand-alone agreement, Santander sent Plaintiffs a letter on or about March 9, 2009 regarding the new Proposed Settlement Agreement, stating that "the purpose of this letter is to summarize the principal terms of a credit proposal in relation to the preferred shares ('Preferred Securities') that you will receive under the terms and conditions of the Exchange Agreement." Santander Miami's representative also orally confirmed that Plaintiffs had to conditionally accept the Exchange Agreement pending completion and funding of the Note and Pledge Agreement and that Plaintiffs' signing of the Exchange Agreement was an act of "good faith" by Plaintiffs because the Bank "did not have the time to prepare the Note and Pledge agreements until the Exchange Agreements were completed." [D.E. 27 ¶¶453 – 454).

A Term Sheet signed by Santander also links the Exchange Agreement, Note and Pledge Agreement as a single transaction. The Term Sheet states that all four Plaintiffs would sign the Exchange Agreement; the contemplated Note would then be completed and funded by Friday, April 25, 2010; the principal of the Note would be secured by the Preferred Shares issued pursuant to the Exchange Agreement; and the Exchange Agreements would be assignable from three of the Plaintiffs to the principal Plaintiff, Solymar Investments, Ltd. [D.E. 27, Exh. 4]. According to the complaint, but for the promised Note and Pledge, Plaintiffs would not have signed the Exchange Agreements. All parts were interconnected and had to be completed to have a final, valid contract.

Plaintiffs contend that after the Note and Pledge were not forthcoming in the agreed-upon fashion, and after further efforts at negotiating a global settlement with Santander, the parties failed to ever into a binding agreement, which represented a condition precedent to the formation of the Exchange Agreement.  Consequently, one year later on March 8, 2010, Plaintiffs filed a Complaint (later amended) against these Defendants alleging eleven (11) causes of action.  [D.E. 1, 27].  Plaintiffs sued the Santander entities and individuals with breach of fiduciary duty, negligence, unjust enrichment, common law fraud, securities fraud under Florida and federal law, and declaratory relief seeking to void the Exchange Agreement.

In response, Defendants moved at the outset to dismiss Plaintiffs' complaint. This motion relies on the arbitration provisions of the Exchange Agreement for any disputes under or related to the agreement being resolved via arbitration in Switzerland, as well as the provisions requiring that any determination regarding the enforceability of the arbitration clause or adjudication of non-arbitrable claims be subject to the exclusive jurisdiction of the courts in Geneva, Switzerland. [D.E. 15].[1]

---

[1]    Defendants also later moved for dismissal of the pending amended complaint on substantive grounds raised under Fed. R. Civ. P. 12(b)(6) [D.E. 46], which motion is also now ripe for disposition.  Given the recommended disposition of the pending motion on arbitration or forum selection grounds, that motion to dismiss will be rendered moot.

## II. ANALYSIS

### A. *Enforcement of Arbitration Clause*

On March 13, 2009, *after* public disclosure of the Madoff ponzi scheme, *after* criminal, bankruptcy, and administrative proceedings were initiated over a year prior against Madoff and others related to his scheme, and *after* Plaintiff and other Madoff-investing clients had clearly learned of the possible loss of all or some of their related investments, each of the Plaintiffs executed an Exchange Agreement that included arbitration and forum selection clauses with Santander Bank and Trust, Ltd. "(SBT"), an indirect wholly owned subsidiary of Santander Spain, located in Nassau, Bahamas. The Exchange Agreement defines "Bank Parties" as "Bank, the Optimal Funds, the Bank Group or any (present or former) directors or employees of any of the referred entities." [D.E. 15-1 at 6, Exchange Agreement ¶ 3(F)].  The term "Bank" is defined as SBT [*Id.* at 3 ¶ I], and the term "Bank Group" is defined as "the ultimate parent of the Bank and its subsidiaries." [*Id.* at 3 ¶ VIII].  Thus, Banco Santander International (the parent bank) and Optimal Investment Services S.A. (a Swiss investment management company that managed the Optimal SUS fund, where Plaintiffs invested their assets) are included as members of the "Bank Group." [D.E. 27 ¶¶ 16-18, 20-21].

Each Plaintiff was represented by a U.S.-licensed lawyer who negotiated and approved the Exchange Agreement prior to Plaintiffs entering into it.  The consideration for the Agreement, as expressly set forth in writing therein, was the fact that the Santander Bank Group was entering into an accommodation with its clients "in view of the exceptional and unforeseeable circumstances affecting Madoff Securities

and Madoff, the uncertainties surrounding the legal, financial and economic situation of Madoff securities deriving therefrom," and other factors, most especially the fact that "all redemptions and the calculation of the net asset value of [the invested accounts] were suspended with immediate effect on, respectively, 15 December 2008 and 16 December 2008 . . . ." [D.E. 15-1 at 2-3]. That accommodation involved the exchange of the Madoff-invested shares in Santander's funds with preferred securities to be reinvested in Santander accounts.

As part and parcel of that "exceptional" Agreement, the parties also agreed on an Arbitration Clause as follows:

6.1   <u>SUBMISSION TO ARBITRATION</u>

(A) The Parties agree that all controversies between the Client and the Bank or the Bank Parties arising out of or relating to this Agreement or matters related thereto, shall be finally and exclusively settled by arbitration in law in accordance with the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with the said Rules, which the Parties declare to know. All arbitration proceedings will be held in Geneva, Switzerland.

Exchange Agreement ¶ 6.1(A) [D.E. 15-1 at 8].

Further, the Agreement provided that all disputes arising from the agreement and Plaintiffs' investments with SBT be settled by arbitration in Switzerland. As a result, Plaintiffs here do not dispute that many of the asserted claims fall within the scope of this clause as they relate to the original Exchange Agreements between Plaintiffs and Defendants.[2] In opposition to the pending motion to dismiss, however,

---

[2]   Furthermore, Section 5 of the Exchange Agreement provides that the Agreement "shall be governed and construed in accordance with the laws of the Commonwealth of The Bahamas . . ." [Exchange Agreement ¶ 5]. Accordingly, Santander argues, to the extent the Court finds that Plaintiffs have challenged the

Plaintiffs argue that we should not enforce the clause because 1) the Exchange Agreement was signed as a condition precedent to an overall settlement between the parties that never came to pass; and 2) the Exchange Agreement was procured by fraud.

### 1. General Principles

It is well established that Federal law strongly favors the arbitration of disputes and requires that federal courts rigorously enforce arbitration agreements. *See Dean Witter Reynolds,* Inc. v. Byrd, 470 U.S. 213, 221 (1985); *United States Fid. & Guar. Co. v. West Point Constr. Co., Inc.*, 837 F.2d 1507, 1508 (11th Cir. 1988) (noting "the strong policy favoring arbitration expressed by Congress in the Federal Arbitration Act"). Consistent with this policy, courts must construe arbitration clauses "generously, resolving all doubts in favor of arbitration." *Seaboard Coast Line R.R. Co. v. Trailer Train Co.,* 690 F.2d 1343, 1348 (11th Cir. 1982).

To the extent there may be any ambiguities with respect to the scope of an arbitration provision, such ambiguities should be resolved in favor of arbitration. *E.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983); *Paladino v. Avnet Computers Techs.,* 134 F.3d 1054, 1057 (11th Cir. 1998) (because the FAA creates a presumption in favor of arbitration "parties must clearly express their

---

arbitration clause itself the Court should apply the law of the Bahamas to determine whether Plaintiffs were fraudulently induced. *Bhim v. Rent-A-Center, Inc.*, 655 F. Supp. 2d 1307, 1311 (S.D. Fla. 2009) (noting that, when a party has specifically challenged the making of an arbitration provision, "defenses such as fraud, unconscionability, and duress are governed by state law"). Plaintiffs disagree and argue that Florida law governs the dispute at least with respect to the choice of venue. We will assume, without deciding the question, that Plaintiffs are correct.

intent to exclude categories of claims from their arbitration agreement"); *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 945 (1995) (issues will be deemed arbitrable unless it is clear that the arbitration clause has not included them).

In short, arbitration cannot be denied unless no interpretation of the arbitration clause covers the asserted dispute. *See, e.g., United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960). This is consistent with the intent of Congress in enacting the FAA: to place arbitration agreements on the same footing as other contracts, and to avoid the costliness and delays of litigation. *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 511 (1974). Accordingly, the FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Under the FAA, a federal court must stay or dismiss proceedings where the parties have agreed in writing to arbitrate a dispute, and must compel the parties to arbitrate when there has been a "failure, neglect or refusal" to comply with the arbitration agreement. 9 U.S.C. §§ 3-4. More specifically, Section 3 provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

By these express terms, the FAA does not provide for the exercise of discretion by a court, but instead mandates that district courts stay or dismiss the action and direct parties to proceed to arbitration on issues covered by an arbitration provision. *See, e.g., Creative Tile Mktg., Inc. v. SICIS Int'l, S.R.L.,* 922 F. Supp. 1534, 1539 (S.D. Fla. 1996) (citing *Dean Witter,* 470 U.S. at 218).

A court must consider three factors in determining a party's right to arbitrate: (1) whether a written agreement exists between the parties containing an arbitration clause; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration has been waived. *See, e.g., Sims v. Clarendon Nat'l Ins. Co.,* 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004).

In this record, there is no dispute that a written agreement exists between the parties that incorporates arbitration. Plaintiffs dispute the enforceability of that agreement, however, based upon failure of conditions precedent and fraud, which will be addressed below. Plaintiffs also do not dispute that some, though not all, of the issues raised in the pending amended complaint are arbitrable if the Exchange Agreement is enforced. Plaintiffs do not challenge the third factor, waiver of arbitration, as the Santander Defendants promptly raised their right to arbitrate in this case. We turn then to the defenses raised by Plaintiffs in opposition to the motion.

## 2.   *Defense to Arbitration On Failure of Condition Precedent*

The Plaintiffs' primary attack on this motion to compel arbitration centers on the argument that the Exchange Agreement is not a valid and enforceable stand-alone contract, but instead one component of a proposed settlement agreement that included

a Promissory Note and Pledge Agreement (the "Proposed Settlement Agreement"). [D.E. 29 at 8]. The Plaintiffs contend that the Exchange Agreement "never came to fruition because certain conditions precedent to the formation of the agreement never occurred –namely execution and funding of the Note and Pledge Agreement." [*Id.* at 11].

Although cases involving issues surrounding the enforceability of arbitration agreements litter the federal reporters, there is little doubt now, especially following recent Supreme Court opinions addressing the subject, as to *who* decides certain issues. In simple terms, contract formation disputes over a contract incorporating an arbitration clause are decided by the courts of law in the first instance.[3] Disputes over the existence of an arbitration agreement within a contract are also decided by the

---

[3]     In *Granite Rock Co. v. International Brotherhood of Teamsters,* ___ U.S. ___, 130 S. Ct. 2847 (2010), the Court's opinion made clear that it was "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Id.* at 2855-56 (citing *First Options of Chicago,* 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary . . . principles that govern the formation of contracts"); *AT&T Technologies, Inc. v. Communication Workers,* 475 U.S. 643, 648-649 (1986) (" 'arbitration is a matter of contract' " and "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444, n.1 (2006) (distinguishing treatment of the generally non-arbitral question whether an arbitration agreement was "ever concluded" from the question whether a contract containing an arbitration clause was illegal when formed that is arbitrable)).

courts.[4] On the other hand, disputes over the enforcement or validity of a contract that incorporates an arbitration clause are for the arbitrators to decide.[5]

Plaintiffs claim that what is at issue here falls within these first two categories. Plaintiffs argue that a contract incorporating arbitration was never formed because the Exchange Agreement was supposed to be part and parcel of an overall settlement agreement, which ultimately was never reached.  Therefore, notwithstanding the otherwise clear and unambiguous language of the Exchange Agreement itself,

---

[4]     As *Granite Rock* explained it, 130 S. Ct. at 2856 (emphasis in original): "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute.  See First Options,* [514 U.S.] at 943; *AT&T Technologies,* [475 U.S.] at 648-649, 106 S. Ct. 1415. To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce. *See, e.g., Rent-A-Center, West, Inc. v. Jackson,* ___ U.S. ___, 130 S. Ct. 2772, ___ L. Ed. 2d ___ (2010) (opinion of Scalia, J.). Where there is no provision validly committing them to an arbitrator, see *ante,* at 2776 - 2778, these issues typically concern the scope of the arbitration clause and its enforceability. In addition, these issues always include whether the clause was agreed to, and may include when that agreement was formed."

[5]     As far back as *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395 (1967), the Supreme Court determined that, when faced with motions to stay suits or order arbitration, courts should evaluate only the existence of the arbitration agreement; challenges to the validity of the entire underlying contract, like fraud in the inducement defenses at issue in that case, must be left to the arbitrator. In this respect, the formation of the agreement to arbitrate is severable from the validity of the claims or defenses that arise from the agreement.  For instance, in *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440 (2006), the Court reviewed a decision of a state court that refused to enforce an arbitration clause in a contract that was challenged as unlawful under state law. Applying *Prima Paint* and *Southland Corp. v. Keating,* 465 U.S. 1 (1984), the Court "conclude[d] that because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court." 546 U.S. at 446.  In short, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 449.

Plaintiffs conclude that the Court should disregard the provisions of the Agreement, including the arbitration clause.

The first major obstacle to Plaintiffs' argument lies in the Exchange Agreement itself.  There is nothing in the face of the Agreement that refers to any condition precedent or to the existence of settlement negotiations over other agreements, including the Note or Pledge Agreement relied upon in Plaintiffs' opposition.  On the contrary, the Exchange Agreement included express provisions that run counter to Plaintiffs' theory.  The Agreement's integration clause provides:

> It is expressly understood and agreed by the Parties that this Agreement contains the entire agreement between the Client, on one hand, and the Bank Group, on the other hand, regarding the subject matter hereof and this Agreement supersedes any and all prior agreements, arrangements or understandings between the Parties relating to the subject matter of this Agreement.  No oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist.

[D.E. 1-2 at 7 ¶ 4.3].

Thus, on the face of this Agreement, and absent any express reference to any condition precedent or any subsequent agreement, the Exchange Agreement signed by both parties does not support Plaintiffs' position.  And Plaintiffs do not provide the Court with any supporting authority for their position that the failure of a condition precedent not set forth in writing can negate any otherwise enforceable written agreement.  To the contrary, the law appears to be well-settled in Florida and elsewhere that conditions precedent must be explicit and unambiguous:

> Provisions of a contract will only be considered conditions precedent or subsequent where the express wording of the disputed provision conditions formation of a contract and or performance of the contract on the completion of the conditions.

*Gunderson v. School Dist. of Hillsborough County,* 937 So. 2d 777, 779 (Fla. 1st DCA 2006) (citing *In re Estate of Boyar,* 592 So. 2d 341, 343 (Fla. 4th DCA 1992) (holding conditions precedent are not favored, and clauses will not be construed as conditions precedent unless the plain, unambiguous meaning o the contract requires the court to do so)).  *See also Kidder Peabody & Co. v. Unigestion Int'l Ltd.,* 903 F. Supp. 479, 501 (S.D.N.Y. 1995) ("a contractual duty is not to be construed as a condition precedent unless the language of the contract clearly imposes such a condition").

There is nothing plain and unambiguous in the four corners of the Exchange Agreement that supports the Plaintiffs' contention that this Exchange Agreement was not a stand-alone contract, that it was merely a precursor to a broader settlement agreement, or that its existence or validity was dependent upon the parties later reaching a broader agreement on the issues raised in this complaint.  Under Florida law, therefore, which Plaintiffs prefer over the Bahamian choice of law clause that is incorporated in the Agreement, Plaintiffs' argument that the Agreement's formation is negated by an implied or understood condition precedent fails.  *See, e.g., Garcia v. Tarmac American Inc.,* 880 So. 2d 807, 809 (Fla. 5th DCA 2004) (rejecting parole evidence as to scope of release because intent of the parties to unambiguous contract must be determined from only the four corners of the document, not parol evidence); *Barakat v. Broward County Housing Auth.,* 771 So. 2d 1193, 1194-95 (Fla. 4th DCA 2000) ("In the absence of ambiguity, the language itself is the best evidence of the parties' intent and its plain meaning controls. Contracts are to be construed in accordance with the plain meaning of the words contained therein.").

Our analysis indeed follows the Florida appellate court's holding *Gunderson,* in a case which involved a similar settlement agreement (in a worker's compensation case between the employer and employee) that included a provision that the employee would also enter into a general release as part of the parties' settlement of the action. 937 So. 2d at 778-79.  The claimant employee died after entering into the settlement agreement but before executing a general release.  On a motion to enforce the settlement, the employer objected to performance on the settlement based upon the deceased employee's failure to execute the general release.  The Court of Appeals reversed the trial court's refusal to enforce the agreement because, even though the settlement agreement expressly included the general release provision, it was not set forth in explicit terms that rendered the release a condition precedent for performance under the agreement.  *Id.* at 779.  The Court rejected "the [employer's] assert[ion] that the deceased's execution of the general release and voluntary resignation were either conditions precedent or conditions subsequent to the formation of a valid contract . . . . This argument is without merit."  *Id.   Cf., Quinlan v. Ross Stores,* 932 So. 2d 428, 429 (Fla. 1st DCA 2006) (settlement agreement was not enforceable for failure of condition precedent, the subsequent execution of additional documents, where the face of the agreement included an express contingency to that effect).

Our analysis is also illustrated by an even more analogous case applying New York law, where a court compelled arbitration on an insurance contract despite the assertion of a condition precedent defense.  *See Christian Mutual Life Ins. Co. v. Penn Mutual Life Ins. Co.,* 163 F. Supp. 2d 260 (S.D.N.Y. 2001).  There, like here, a party to

an agreement that included an arbitration clause sought to avoid arbitration on the argument that the failure to comply with a condition precedent (which was not explicitly made clear in the agreement itself) rendered the contract and the arbitration clause unenforceable because it voided the formation of the underlying contract. *Id.* at 262. Apart from holding that a condition precedent defense is not a defense to formation at all, a topic we will address below, the Court also held as a matter of state contract law that the condition precedent could not be used to avoid formation of the contract where it was not expressly set forth as such in the body of the agreement. *Id.* at 263. As a result, the Court enforced the arbitration agreement.

*Gunderson, Christian Mutual,* and many other similar cases referenced therein fully support the Court's conclusion here that Plaintiffs cannot invoke a condition precedent argument to disavow formation of an agreement with the Santander Defendants, where the clear language of the Exchange Agreement makes no reference to the conditional nature of a later broader settlement agreement or a Note and Pledge Agreement. As a matter of law, even assuming that this Court was properly deciding the issue, Plaintiffs' argument in this respect is meritless.[6]

---

[6]    A review of the Plaintiffs' authorities cited in opposition to the motion on this point only buttresses the Court's analysis. Plaintiff relies for instance on condition precedent cases like *Adams v. Suozzi,* 350 F. Supp. 2d 279 (E.D.N.Y. 2004), for the proposition that the failure of a condition precedent may nullify a contract with its arbitration clause. Yet, *Adams* held as much precisely because the "plain meaning of the contract" (not parole evidence, not affidavits from counsel, not tangential oral understandings) required enforcement of a condition precedent before a binding agreement could be enforced. *Id.* at 283-84. *See also David v. Richman,* 568 So. 2d 922, 924 (Fla. 1990) (in contrast to this Exchange Agreement, the contract those parties signed lacked written evidence of mutual assent because the "only material terms contained in the form contract at the time it was signed by David were the names of the parties. . . . There is no objective basis upon which the court could imply

But this then leads us to another problem that Plaintiffs cannot overcome. Because Plaintiffs are challenging the "formation" of the underlying contract between Plaintiffs and the Santander Defendants as the basis for the Court (rather than the arbitrator) to adjudicate their argument, the predicate question that we must ask is whether a defense based upon failure of a condition precedent is a "formation" defense at all. The Santander Defendants take the position that it is not. We agree.

Certainly, cases like *Christian Mutual* fully support Defendants' position. Judge Rakoff in that case first found that an insurance agreement incorporating arbitration was not subject to a formation defense on the basis of a condition precedent. "First and foremost, an alleged failure to fulfill an expressly-stated provision of the Agreement, whether characterized as a 'condition precedent' or otherwise, is itself a 'dispute or difference between the parties with respect to this Agreement,' and therefore entirely within the scope of what the parties expressly agreed to arbitrate." 163 F. Supp. 2d at 262. In other words, though a court has the obligation to review a formation of contract challenge to an arbitrable agreement, a condition precedent challenge does not generally fall within that category. Instead, as per *Prima Paint,* such a defense to performance of the contract is part and parcel of the underlying dispute, which is a matter that only the arbitrator can address. *Id.* at 263 (enforcing arbitration provision).

---

a reasonable financing arrangement."); *In re Rapid Settlements, Ltd.,* 202 S.W.3d 456, 462 (Tex. Ct. App. 2006) (in contrast to this Exchange Agreement, those parties' written agreement incorporated as a matter of law a condition precedent *imposed by Texas statutes* for court approval of transfer of settlement payment rights).

This analysis has been followed in other cases the Court has found raising this precise question.   For instance, Judge Myron Thompson from our Circuit held in *Capitol Vial, Inc. v. Weber Scientific,* 966 F. Supp. 1108 (M.D. Ala. 1997), and *Rainbow Invest., Inc. v. Super 8 Motels, Inc.,* 973 F. Supp. 1387 (M.D. Ala. 1997), that defenses to arbitrable contracts based upon failures of condition precedent were matters that did not implicate formation defenses to the existence of the underlying contracts, which therefore required enforcement of the arbitration provisions in the contracts.   Judge Thompson analyzed a series of cases that supported his conclusion that failure of condition precedent defenses "[did not] fall into that narrow, but hazily defined class of cases where not merely the enforceability, but the initial formation or existence of a contract, including a disputed arbitration clause, is legitimately brought into question, and must be decided by the court."  973 F. Supp. at 1390.

We fully agree with these cases.  A defense based upon the failure of a condition precedent is ordinarily not a formation challenge, but instead a defense to a breach or to excuse performance.   A formation challenge must rise to the level of fraud in the factum, as described by the Eleventh Circuit in *Cancanon v. Smith Barney Harris Upham & Co.,* 805 F.2d 998, 1000 (11th Cir. 1986) (drawing distinction between fraud in the inducement defenses to contract performance with fraud in the factum challenges to the creation of a contract at all).   There must be a showing by substantial competent evidence that a misrepresentation of the character or essential terms of the contract is at play, making assent to the contract impossible.  *See, e.g., Chastain v. The Robinson-Humphrey Co.,* 957 F.2d 851, 855 (11th Cir. 1992) ("*Prima Paint* has never

been extended to require arbitrators to adjudicate a party's contention, supported by substantial competent evidence, that a contract never existed at all."); *Royal Ins. Co. of America v. BHRS LLC,* 333 F. Supp. 2d 1293, 1297 (S.D. Fla. 2004) (citing *Cancanon,* 805 F.2d at 1000) (rejecting argument that party's intent not to create a contract required adjudication of the issue by the court, and compelling arbitration).

A legitimate formation challenge exists, for instance, where a party claims that a person who purportedly entered into an arbitrable agreement did not have authority to do so.  *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,* 925 F.2d 1136, 1139 (9th Cir. 1991).  Other examples include formation challenges based upon a forged signature to an arbitrable contract, or because an imposter purported to be an agent of that party with authority to bind it, or because the party was fraudulently told the contract was something other than what it actually was, or because the party did not intend to manifest assent but was physically forced to do so.  *See In re Arbitration Between Nuclear Elec. Ins. Ltd.,* 926 F. Supp. 428, 434 (S.D.N.Y. 1996).  "The common feature of most, if not all, such cases is a viable claim of lack of assent to the contract, and by extension, the arbitration clause it contains."  *Rainbow Invest.,* 973 F. Supp. at 1391 (citing cases).[7]

_____

[7]      Again, the Plaintiffs' authorities cited on this point bolster the Court's analysis.  *See, e.g., Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.,* 272 Fed. Appx. 782, 786 (11th Cir. Apr. 3, 2008) (party challenged formation of arbitration agreement based upon sworn denial that an agent of that party ever signed arbitrable form contract, which raised an issue of fact under section 4 of the FAA, *in contrast to* Plaintiffs here who never denied signing their Agreements following extensive negotiation and consultation with counsel); *Deal Farms, Inc. v. Farm & Ranch Supply, Inc.,* 382 So. 2d 888, 889-90 (Fla. 1st DCA 1980) (party challenged existence of binding agreement by claiming that he never signed the fully completed document, which raised a fact issue allowing for consideration of parol evidence, *unlike* Plaintiffs here).

But where contractual defenses to performance are raised under the guise of formation challenges, courts properly reject such arguments in favor of arbitration because they are matters that go to the validity, enforcement, or legality of an underlying contract, but do not negate the very existence of the contract. *See, e.g., Benoay v. Prudential-Bache Sec., Inc.,* 805 F.2d 1437, 1441 (11th Cir. 1986) (claims of "adhesion, unconscionability, waiver of judicial remedies without knowledge, and lack of mutuality of obligation" are to be decided in arbitration).

In short, in the ordinary course a challenge to the existence of a contract based upon a failure of a condition precedent is no different than a challenge based upon fraud in the inducement, which the Supreme Court in *Prima Paint* specifically excluded from the category of challenges a court must adjudicate as opposed to the arbitrator.   The failure of a condition precedent is predominantly a defense to performance.   *See, e.g.,* Restatement (First) of Contracts § 250 ("Definition Of "Condition Precedent" . . . is according as the context indicates, either a fact (other than mere lapse of time) which, unless excused as stated in §§ 294-307 (a) must exist or occur before a duty of immediate performance of a promise arises, in which case the condition is a "condition precedent").   A defense to performance of the underlying contract, under *Prima Paint*, is a matter that must be addressed to the arbitrator.

That is not to say that parties cannot expressly agree to a condition precedent to the very existence of a contractual relationship between the parties.   It is certainly possible for parties to agree on conditional language necessary for formation of a binding contract. *See, e.g., Adams v. Suozzi,* 340 F. Supp. 2d at 283.   But as the

foregoing discussion shows, such an agreement must be explicit and plainly stated in the four corners of the document. *See id.*  Here, Plaintiffs' argument fails in both respects.  There is no express condition to formation in this Agreement.  And to the extent that Plaintiffs can assert a condition to performance, that condition must be adjudicated by the arbitrator pursuant to the arbitration clause in the Agreement.

### 3.   *Defense to Arbitration Based on Fraud*

In the same vein, Plaintiffs contend that the Arbitration Clause of the Exchange Agreement "is unenforceable because they were fraudulently induced to sign the Exchange Agreement and to agree to the arbitration clause therein, in particular." [D.E. 1 ¶ 466].  But Plaintiffs fail to specifically allege any misrepresentation that allegedly induced them to agree to the Arbitration Clause, other than those that relate generally to the Exchange Agreement as a whole.

Again, courts have drawn a distinction between "claims that challenge the contract generally and claims that challenge the arbitration provision itself." *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 876 (11th Cir. 2005) (citing *Prima Paint,* 388 U.S. at 403).  While a district court may decide allegations of fraud in the inducement that pertain specifically to an arbitration provision, claims of fraud in the inducement as to a contract as a whole must be resolved in arbitration.  *Jenkins*, 400 F.3d at 876-77.  *See also John B. Goodman Ltd. P'ship v. THF Constr., Inc.*, 321 F.3d 1094, 1095-96 (11th Cir. 2003); *Kaplan v. Divosta Homes, L.P.*, 983 So. 2d 1208, (Fla. 2nd DCA 2008).

Here, Plaintiffs allege they were fraudulently induced into signing the Exchange Agreement because Defendants represented to them that the Exchange Agreement would incorporate other documents, even though Defendants had "no intention of executing a conforming Note and Pledge as required to complete the parties' settlement agreement." [D.E. 1 ¶ 478].   These arguments have nothing to do with the Arbitration Clause.   Instead, Plaintiffs are alleging that they were misled into signing the Exchange Agreement a whole.   Because Plaintiff's challenge is "to the validity of the contract as a whole," it must be decided by an arbitrator.   *See also Buckeye,* 546 U.S. at 448-49 (a claim that the entire contract is illegal and void *ab initio* under state law must be arbitrated); *Prima Paint*, 338 U.S. at 403-04 (a claim of fraud in the inducement of the entire contract must be arbitrated); *Jenkins*, 400 F.3d at 876-77 (claim that the entire contract is an adhesion contract must be arbitrated).

Accordingly, these allegations clearly do not allow Plaintiffs to avoid the Arbitration Clause, any more than their condition precedent defenses can accomplish the same thing.   Moreover, these claims of fraud that seek to challenge the contract generally are based on conclusory statements without specific facts.   *Cf., Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (holding that courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, we agree with Defendants that, in an attempt to avoid their agreement to arbitrate, Plaintiffs make only conclusory allegations that they were fraudulently induced into signing the arbitration clause in

the Exchange Agreement. [D.E. 15-12]. These bald, conclusory allegations are without any factual support and should be discounted. *See Iqbal*, 129 S. Ct. at 1949-50.

To the extent Plaintiffs do allege sufficient facts, they make clear that their theories of fraudulent inducement relate to the Exchange Agreement as a whole, and not to the Arbitration Clause in particular. Thus, because the Plaintiffs fail to allege facts of fraud specific the Arbitration Clause, the clause cannot be disregarded on this basis.[8]

**B.**  ***Even if the Arbitration Clause is Not Enforced, the Parties' Choice of Forum Governs any Non-arbitrable Disputes***

Motions to dismiss based on forum selection clauses are cognizable as motions to dismiss for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1290 (11th Cir. 1998). When a valid forum selection clause exists, the party seeking to defeat the agreed upon venue "bears the burden of persuading the court that the contractual forum is sufficiently inconvenient to justify retention of the dispute." *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989).

---

[8]   Based on this determination, we need not reach the merits of the fraud arguments raised here. The arbitrator will consider them in the first instance and determine if they are sufficient to invalidate the agreement. We note, however, that we are hard-pressed to understand how a viable fraud theory is even possible, where Plaintiffs allegedly relied on misrepresentations of a bank official after they retained counsel to pursue relief against Santander, after discovery of a massive fraud that allegedly caused much damage to these Plaintiffs' investments, after litigation was surely imminent, and after Plaintiffs had already suspected Santander of facilitating criminality. A show of "good faith" hardly seems sufficient to overcome these undisputable facts. A well-represented litigant's resort to fraud defenses under these circumstances clearly raises the judicial eyebrow. But it is the arbitrator's eyebrow that matters.

Forum selection clauses are presumptively valid, and the burden of proving their unreasonableness is a heavy one. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991). A forum selection clause may be unreasonable where: 1) incorporation of the clause was the product of fraud or overreaching; 2) a party will "for all practical purposes be deprived of his day in court" because of inconvenience or unfairness of the selected forum; 3) the unfairness of the chosen law will deprive the plaintiff of a remedy; or 4) enforcement of the clause would contravene a strong public policy of the forum state. *Id.* The Eleventh Circuit has upheld these principles. *See, e.g., P & S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807-08 (11th Cir. 2003) (rejecting argument that financial difficulty of party in litigating in selected forum or congestion of docket in selected forum are sufficient grounds for refusal to enforce a clause).

The validity of a forum selection clause is determined under the usual rules governing the enforcement of contracts in general. *Id.* (citing *In re Ricoh Corp.*, 870 F.2d at 573-74). To bind a non-party to a forum selection clause, that person "must be closely related to the dispute such that ti becomes foreseeable that he will be bound." *Lipcon*, 148 F.3d at 1299; *see also Manett- Farrow, Inc. v. Guci America, Inc.*, 858 F.2d 509, 514 n. 5 (9th Cir. 1988) ("[A] range of transaction participants, parties and nonparties, should benefit from and be subject to forum selection clauses.").

Finally, in considering such a motion, the court accepts the facts in a complaint as true. *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004). A court may also "consider matters outside the pleadings if presented in proper form by the parties." *MGC Commc'ns, Inc. v. Bellsouth Telecomms., Inc.*, 146 F. Supp. 2d 1344,

1349 (S.D. Fla. 2001) (citing 5A Charles A. Wright & Arther R. Miller, *Federal Practice & and Procedure* § 1364 (2d ed. 1990)). Where conflicts exist between allegations in the complaint and evidence outside the pleadings, the court "must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Wai,* 315 F. Supp. 2d at 1268.

To the extent that we agreed with Plaintiffs that a court, not an arbitrator, should resolve defenses related to enforceability of the Arbitration Clause, this Court must still dismiss this action because the parties have contractually agreed that the exclusive venue for resolution of such claims is a court in Geneva, Switzerland.

The Forum Selection Clause incorporated in the Exchange Agreement states:

> Subject to and without limiting the provisions of the Parties' agreement to arbitrate, the Client irrevocably agrees that all claims: (i) to enforce the Parties' agreement to arbitrate, (ii) to confirm any arbitration award entered pursuant to the Parties' agreement to arbitrate, (iii) in the event that the Parties' agreement to arbitrate is found to be unenforceable, or (iv) in the event that a court finds that claims brought by the Bank or the Client are not covered within the scope of the Parties' agreement to arbitrate will be heard and determined exclusively in the courts sitting in Geneva, Switzerland. The Client hereby irrevocably submits to the exclusive jurisdiction of any court sitting in Geneva, Switzerland related to these claims. In any such action or proceeding, the Client waives any objection based on forum non conveniens or venue.

[D.E. 15-1 at 8 ¶ 6.2]. Thus, the plain language of the clause requires on its face that all non-arbitrable disputes arising from Plaintiff's investments with Defendants to be filed in courts sitting in Geneva, Switzerland.

As we discussed in the preceding discussion,"the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter."

*First Options of Chicago, Inc.,* 514 U.S. at 943; *see also Mercury Telco Group, Inc. v. Empresa de Telecomunicaciones de Bogota S.A. E.S.P.*, 670 F. Supp. 2d 1350, 1355 (S.D. Fla. 2009) (dismissing action because "the Court finds clear and unmistakable evidence of the parties' intent to delegate the issue of arbitrability of the claims to an arbitrator."). Here, the Exchange Agreement makes clear that the parties have expressly agreed to delegate the issue of arbitrability to a Swiss court.

In order to overcome the plain meaning of a forum selection agreement, the Plaintiffs must make a strong showing that enforcement would be unreasonable or unjust or that the clause is invalid due to fraud or overreaching. *Consol. Mgmt. Solutions, Inc. v. Dennis*, No. 3:07-civ-1192-J16-MCR, 2008 WL 2694107, at *2 (M.D. Fla. July 7, 2008); *see also In re Ricoh Corp.*, 870 F.2d at 574 (holding that suit must present an "exceptional situation" to justify not enforcing a forum selection clause); *Picken v. Minuteman Press Int'l, Inc.*, 854 F. Supp. 909, 911 (N.D. Ga. 1993) ("This burden is extremely difficult to overcome.").

Here, Plaintiffs allege that the forum selection clause is invalid due to fraud [D.E. 29 at 16] and that they were fraudulently induced into entering into the Exchange Agreement. But the test for invalidating a forum selection clause on grounds of fraud is similar to the test for invalidating an arbitration clause: the fraud must be specific to the a forum selection clause in order to invalidate it. *See Tradex Global Master Fund SPC Ltd. v. Palm Beach Capital Management, LLC*, No. 09-21622-CIV, 2010 WL 717686, at *5 (S.D. Fla. March 1, 2010).

This Court confronted similar facts and arguments in *Tradex* where it found that the exception for enforcement of forum selection clauses for fraud and overreaching "does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud . . . the clause in the contract was the product of fraud or coercion." *Tradex*, 2010 WL 717686, at *5 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974)). "Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." *Id.* Therefore, fraud and overreaching must be specific to a forum selection clause in order to invalidate it.

Here, however, Plaintiffs have presented no evidence that the forum selection clause in invalid due to fraud or overreaching. And contrary to Plaintiffs' position, a mere allegation of fraudulent activities on the part of Defendants pertaining to subsequent misappropriation of Plaintiff's funds is not sufficient to invalidate the forum selection clause. *Tradex*, 2010 WL 717686, at *5 (citing *Mercury West A.G., Inc. v. R.J. Reynolds Tobacco Co.*, No. 03 civ. 5262(JFK), 2004 WL 421793 (S.D.N.Y. Mar. 5, 2004) ("in order to invalidate the forum selection clause, the clause itself would have to have been the product of fraud"); *Giordano v. Witzer*, 558 F.Supp. 1261, 1264 (E.D. Pa. 1983) (charge of fraud in the inducement of the agreement of sale is insufficient to invalidate the forum selection clause); *see also Lipcon*, 148 F.3d at 1296 ("By requiring the plaintiff specifically to allege that the choice clause itself was included in the contract due to fraud in order to succeed in a claim that the choice clause is unenforceable, courts may ensure that more general claim of fraud will be litigated *in*

*the chosen forum*, in accordance with the contractual expectations of the parties.")
(emphasis in the original)).

We thus find that the Plaintiffs' challenge to this forum selection clause is not
separate and distinct from its challenge to the entire agreement. Therefore, because
we can only set aside a forum selection clause if a party was fraudulently induced to
include the clause itself in the agreement, we conclude that the forum selection clause
in the Exchange Agreement was not a product of fraud or overreaching based on the
record evidence we have.[9]

We are left instead with an otherwise enforceable forum selection clause that
requires that any non-arbitrable disputes arising from the Exchange Agreement be
raised in Swiss courts. This finding then leads to the final issue raised in opposition
to the pending motion. Plaintiffs contend that only certain claims alleged in the
amended complaint are referable to arbitration or for litigation in the parties' chosen
forum. But because all of Plaintiffs' claims must be submitted to arbitration, dismissal

---

[9]     We also find unpersuasive Plaintiffs' remaining challenges to a Swiss
forum. Though Plaintiffs claim that the action should not be dismissed because there
is no nexus between the parties and Switzerland, there is also very minimal connection
between the parties and this District in Florida. In fact, the Plaintiffs here are four
investment companies incorporated in the Cayman Islands, owned by Panamanian
citizens, with account relationships with a Bahamian bank which is part of a Spanish
banking group. While no party to this case resides in Florida, two of the Defendants,
Optimal Investment Services, S.A. and Manuel Echeverria, reside in Switzerland.
Hence, there is indeed a sufficient nexus to Switzerland, the most important of which
is the parties' Exchange Agreement that provided for a Swiss forum. We also reject the
hardship arguments raised in opposition to enforcement of the choice of forum
provision. *See, e.g., Seung v. Regent Seven Seas Cruises, Inc.,* 393 Fed. Appx. 647 (11th
Cir. Aug. 19, 2010) (plaintiff failed to make the strong showing required to prove that
the forum selection clause should not be enforced, either due to medical or financial
hardship).

of this action is appropriate.  The plain language of the Exchange Agreement, which requires arbitration of any disputes between "the Client and the Bank or the Bank Parties arising out of or relating to this Agreement or matters related thereto," shows that the parties intended for the Arbitration Clause to encompass all potential disputes related to the subject matter of the Exchange Agreement, including disputes expressly covered by the Release that is part and parcel of the Agreement.  That Release covers all claims "arising out of or in connection with or relating to the Optimal Strategic US Equity Series of Optimal Multiadvisors Ltd., the Optimal Strategic US Equity Ireland Fund, the Client's Optimal SUS Securities or the Client's investment in the Optimal Funds." [D.E. 15-1 at ¶3(F)].

Here, all of Plaintiffs' claims relate to Plaintiffs' investments in the Optimal funds, and specifically SUS.  Accordingly, all of the claims relate to the subject matter of the Exchange Agreement and are within the scope of the Arbitration Clause.  But even if they were not all included, Section 3 of the FAA requires that a district court stay the proceeding if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceedings.  Dismissal without prejudice would thus be appropriate because the crux of the claims clearly fall within the scope of the Arbitration Clause, or otherwise they would be subject to the exclusive jurisdiction of the Swiss courts.

Plaintiffs' arguments on this latter question miss the mark.  Whatever the label or characterization that one chooses to use, the record shows that Plaintiffs' claims are all founded or premised upon the purchase of Optimal funds.  *See, e.g., Gregory v.*

*Electro-Mechanical Corp.,* 83 F.3d 382, 384 (11th Cir. 1996) (court should focus on complaint's factual allegations, not legal theories, when determining whether claim falls within scope of arbitration agreement). For instance, Plaintiffs have not specified a single, unsuitably risky security other than Optimal funds that Defendants recommended for purchase by Plaintiffs. Nor have they identified any security other than Optimal funds that Defendants purchased on Plaintiffs' behalf in order to generate improper fees or commissions, nor any security other than Optimal funds that Defendants failed to exercise due care in recommending to Plaintiffs.

Thus, the face of the amended complaint shows that all of Plaintiffs' claims are premised or dependent upon Defendants' recommendations that Plaintiffs invest in Optimal funds. In that case, even though theoretically one particular claim alleged in this amended complaint may not directly arise out of litigation over the scope and validity of the Exchange Agreement, it is impossible for Plaintiffs to succeed without those issues being adjudicated in Plaintiffs' favor. Plaintiffs are thus in a similar position as the plaintiffs in a recent Eleventh Circuit case that reversed the denial of a motion to compel arbitration, *Physician Consortium Servs., LLC v. Molina Healthcare, Inc.,* No. 10-13427 (11th Cir. Feb. 11, 2011) (reversing district court denial of motion to compel arbitration over action on guaranty agreement that lacked arbitration agreement found in underlying purchase agreement). Those plaintiffs' non-arbitrable claims (or claims against non-arbitrating parties) were clearly "intimately founded in and intertwined with the obligations imposed by the [agreement containing the arbitration clause]." *Id.*, slip. op. at 7 (citing *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 948 (11th Cir. 1999)). The same holds true in this case.

Accordingly, the Court is properly enforcing the arbitration clause within the Exchange Agreement when it dismisses this action in favor of either arbitration under the Agreement, or at least litigation over any non-arbitrable issues over the agreement in Switzerland.  Plaintiffs will certainly be free to pursue their invalidity or condition precedent defenses before the arbitrator, who will certainly have the power to invalidate the Exchange Agreement if appropriate.  In that case, Plaintiffs may possibly find their way back to this or some other court.  But in the meantime, the pending action cannot proceed before litigation over the Exchange Agreement is concluded in arbitration or before the Swiss courts.

### III.   CONCLUSION

For the reasons stated above, it is hereby Recommended that:

1.     Defendants' Motion to Dismiss [D.E. 15] be **GRANTED** based upon the arbitration clause and forum selection clause in the parties' Exchange Agreements. The case should be dismissed without prejudice or otherwise stayed pending resolution of all issues before the arbitrator or Swiss court related to the Exchange Agreements.

2.     Defendants' Motion to Dismiss [D.E. 46] on other grounds should be **DENIED AS MOOT**.

3.     Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any.  *R.T.C.*

*v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 14th day of March, 2011.

/s/ Edwin G. Torres
EDWIN G. TORRES
United States Magistrate Judge